IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAIRY AMERICA, INC., | CASE NO. CV F 07-0537 LJO SMS |
| Plaintiff, | **SUMMARY JUDGMENT DECISION** (Doc. 77.) |
| vs. | |
| NEW YORK MARINE AND GENERAL INSURANCE COMPANY, et. al, | |
| Defendants. | |

# INTRODUCTION

A defendant cargo insurer and a defendant insurance underwriter[1] seek summary judgment that plaintiff insured Dairy America, Inc.'s ("Dairy America's") cargo loss is uncovered by a binder or policy to defeat Dairy America's breach of contract claim. Dairy America responds that issues of material fact exist whether its loss was covered in that the binder lacked, although the policy included, an attachment clause which NY Marine and Southern Marine rely on to preclude coverage. Defendant Arthur J. Gallagher & Co. ("Gallagher"), Dairy America's insurance broker, opposes summary judgment on grounds that the binder for Dairy America's policy covers the cargo loss. This Court considered NY

---

[1] The defendants seeking summary judgment are insurer New York Marine and General Insurance Company ("NY Marine") and underwriter Crump Insurance Services dba Southern Marine & Aviation Underwriters, Inc. ("Southern Marine").

1

Marine and Southern Marine's summary judgment motion on the record[2] and VACATES the June 18, 2009 hearing, pursuant to Local Rule 78-230(h). For the reasons discussed below, this Court GRANTS NY Marine and Southern Marine summary judgment on Dairy America's breach of contract claim.

## BACKGROUND

### The Parties

Dairy America, a Fresno corporation, markets and sells powder milk products for shipment throughout the United States and foreign countries. Southern Marine is a managing general agent for cargo insurer NY Marine and is authorized as an underwriter to assess risks and bind NY Marine for ocean cargo insurance. Andrew M. Fossler ("Mr. Fossler") is a Southern Marine senior vice president and underwriter who handled insurance for Dairy America. Gallagher is Dairy America's commercial insurance broker. Southern Marine is not a direct writer of insurance and places insurance through a broker like Gallagher.

### Ocean Cargo Binder

On August 11, 2005 after negotiation with Gallagher, Southern Marine for NY Marine issued to Dairy America a 20-page binder ("binder") for an ocean cargo policy. The binder identifies insured property as:

> LAWFUL GOODS AND/OR MERCHANDISE CONSISTING PRINCIPALLY OF, BUT NOT LIMITED TO, MILK POWDER OF EVERY KIND AND DESCRIPTION AND OTHER GOODS INCIDENTAL TO THE BUSINESS OF THE ASSURED SHIPPED BREAK-BULK AND/OR CONTAINERIZED FORM . . . AND/OR ALL OTHER INTERESTS HANDLED BY THE ASSURED IN THE COURSE OF THEIR BUSINESS AND/OR IN THE CARE, CUSTODY AND CONTROL OF THE ASSURED WHETHER IN TRANSIT OR STORE OR ELSEWHERE ANYWHERE IN THE WORLD . . . (Uppercase in original.)

The binder provided that coverage is "BOUND WITH EFFECT FROM AUGUST 11, 2005 TO EXPIRE OCTOBER 1, 2006, BOTH DAYS AT 12:01 A.M. LOCAL STANDARD TIME AT THE PLACE OF ISSUANCE, OCEAN CARGO/STOCK THROUGHPUT COVERAGE SUBJECT TO THE

---

[2] This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does not rule on objections in a summary judgment context.

FOLLOWING RATES, PREMIUMS, POLICY TERMS, INSURING CONDITIONS AND LIMITS OF LIABILITY." (Uppercase in original.)

The binder included a "lost or not lost" clause which states in pertinent part:

5.   GEOGRAPHICAL LIMITS:

LOST OR NOT LOST, FROM PORTS AND/OR PLACES IN THE WORLD TO PORTS AND/OR PLACES IN THE WORLD DIRECTLY OR VIA PORTS AND/OR PLACES IN ANY ORDER, INCLUDING THE RISK OF TRANSSHIPMENT BY LAND, AIR OR WATER AND INCLUDING WHILE IN STORAGE WORLDWIDE ASHORE OR AFLOAT. THIS INSURANCE SPECIFICALLY COVERS SHIPMENTS BOTH ORIGINATING AND TERMINATING ON LAND WITHIN ANY COUNTRY OF CONTINENT ANYWHERE IN THE WORLD.
. . .
THE INSURANCE ATTACHES FROM THE TIME THE SUBJECT MATTER BECOMES AT THE INSURED'S RISK OR THE INSURED ASSUMES INTEREST OR THE INSURED IS OBLIGATED TO INSURE AND CONTINUES WHILE HELD AS STOCK . . . WHETHER OR NOT IN THE COURSE OF TRANSIT . . .

On August 23, 2005, the ocean cargo policy ("policy") issued to Dairy America and was sent directly to Gallagher. Dairy America paid a $150,000 annual premium for the policy. The policy included the following attachment clause ("attachment clause"): "This insurance attaches to all shipments commencing on or after August 11, 2005 and prior to October 1, 2006, both days at 12:01 A.M. local standard time at place of insurance." The binder lacked such an attachment clause to limit coverage to shipments commencing on or after August 11, 2005.

**Hurricane Katrina Loss**

Dairy America assembled several dozen loads of milk powder for shipment to Havana, Cuba. The loads were to be consolidated at a warehouse in Gulf Port, Mississippi and sent to their final destination.

On August 29, 2005, 59 loads of the milk powder located in the Gulfport, Mississippi warehouse and awaiting shipment were destroyed by Hurricane Katrina. The 59 loads comprised 36 loads that had been shipped after the August 11, 2005 policy coverage inception and 23 loads shipped prior to August 11, 2005.[3]

Gallagher, for Dairy America, presented a claim to Southern Marine for the 59 lost loads. NY

---

[3] NY Marine and Southern Marine note that Dairy America provided bills of lading to indicate that 23 loads of non-fat powder milk began transit prior to August 11, 2005.

Marine's investigation concluded that 23 loads were not covered in that the loads' transit preceded the policy's inception. NY Marine paid Dairy America $1,511,360 for 36 loads which began transit after the policy's inception. Dairy America's claim for the 23 pre-policy inception loads is $971,980.

### Arrangement Of The Binder And Policy

Dairy America had not purchased a prior ocean cargo policy, and Gallagher recommended an ocean cargo policy in that Dairy America began to ship larger quantities of powder milk.

In underwriting and placing the policy, Southern Marine's Mr. Fossler evaluated the risk, assessed the premium, and established insuring terms and conditions. Mr. Fossler used what he characterizes as a standard cargo policy which included a standard CAR-000 form declaration section and a standard CAR-001 form standard policy language. NY Marine and Southern Marine note that Gallagher "was familiar with the policy forms used by Fossler and Southern Marine" and that the policy "is a standard ocean cargo form which Southern Marine has used with insureds of Gallagher since 1999." Dairy America claims "it was unfamiliar with the terms and conditions of such insurance."

According to Southern Marine, in all its dealings with Gallagher involving issuance of cargo policies, "a binder was issued." In his declaration, Mr. Fossler describes a binder as a "snapshot of the final policy" and explains that a binder "establishes that coverage is in force subject to basic insurance terms." Mr. Fossler and Southern Marine note that Southern Marine's binder is a standard form which contains the same attachment language as every ocean cargo policy binder that Southern Marine has issued for Gallagher clients during the past 10 years.

Insurance coverage attorney Erwin Adler ("Mr. Adler") filed a declaration for Gallagher to dispute that a binder is a "snapshot" of a final policy. Mr. Adler declares that a "binder establishes the coverage described in the binder is in force and will cover the insured on the terms stated." Mr. Adler characterizes a binder as "a valid and enforceable contract of insurance" that "sets forth the material terms of the policy" which supersedes the binder "only if the policy contains the same terms and conditions as the binder."

In his declaration, Dairy America insurance coverage expert John R. Adams ("Mr. Adams"), a marine and surplus lines insurance executive, characterizes the binder "as temporary evidence of the insurance coverage" issued by NY Marine/Southern Marine.

**Ocean Cargo Insurance Practices**

NY Marine and Southern Marine note that they are not direct writers of insurance and do not deal directly with insureds, including Dairy America. According to Mr. Fossler, Gallagher transmitted to Southern Marine insurance applications and Dairy America's information on operations and policy descriptions.

Mr. Fossler points out that during the past 10 years, he has dealt with Gallagher senior account manager Ellen M. Jolley ("Ms. Jolley"), who has purchased for clients 100 cargo policies and renewals and first became involved with Dairy America in 1999. In her deposition, Ms. Jolley noted that, prior to the binder's inception, she did not have discussions with Dairy America controller Jean McAbee ("Ms. McAbee") regarding goods already in transit or if they were covered. Ms. Jolley understood that shipments leaving Dairy America's factory or storage facilities prior to the policy's August 11, 2005 inception would not be covered by the policy and that Dairy American had separate coverage for goods in transit prior to August 11, 2005. Ms. Jolley noted that Dairy America did not tell Gallagher that Dairy America had ocean cargo exposure (goods in transit) prior to August 11, 2005.

According to Mr. Fossler, standard practice for ocean cargo insurance is that goods in transit at the time of a policy's inception are not covered by the policy. In his declaration, Mr. Fossler explains:

> The business and insurance reason and practice of why goods whose transit begins prior to the inception of the policy are not covered within the cargo policy is that the underwriter would never know what goods were in transit or where the transit may have begun. Further, the underwriter would have no way of knowing whether or not products such as milk powder could have been damaged, adulterated, lost, or stolen. Finally, there would never have been a way for the underwriter to charge a premium for the risk they [sic] have taken.
>
> . . .
>
> . . . If the shipment date on a bill of lading is prior to the inception date on the policy, the cargo is at risk of the insured's prior insurer or at the insured's own risk.

Mr. Adler disagrees with Mr. Fossler and opines:

> The binder demonstrates that New York Marine issued the throughput policy to cover all damage to all of Dairy America's goods, whether in transit or not, as to which New York Marine had assumed the risk of loss which would be damaged during the policy period. The binder did not set forth any limits as to coverage based upon the date of shipment.
>
> . . .

5

       Had New York Marine intended to issue a claims-made type of policy, the binder should have set forth a retroactive date. Like most other insurance policies (and their binders), this binder did not include any such date.

### Dairy America's Expectations

In her declaration, Dairy America controller Ms. McAbee states: "Dairy America requested and understood it was purchasing an insurance policy to cover all its products, wherever they were located and whether in transit or storage. . . . Dairy America wanted and understood, based on the Binder, that its powdered milk product was covered 'whether in transit or store or elsewhere anywhere in the world . . .'"

Ms. McAbee explains that neither Ms. Jolley nor anyone else at Gallagher explained that "the insurance coverage Dairy America was purchasing was limited to shipments that commenced after the effective date of coverage. I thought that on the effective date, all shipments whether in transit or in storage were covered." Ms. McAbee further notes that no one from NY Marine or Southern Marine, including Mr. Fossler, inquired whether Dairy America "had product currently in transit" or explained that "the insurance coverage Dairy America was purchasing was limited to shipments that commenced after the effective date of coverage."

Ms. McAbee concludes that if she had known that Dairy America's product shipped prior to the effective date of insurance coverage was not covered, she would have either "requested additional coverage" from NY Marine and/or Southern Marine or "if necessary, would have looked for other insurers to obtain insurance coverage for that product." Dairy America claims "it was unaware that there might be an issue with coverage of its product that had commenced shipment prior to August 11, 2005."

As of the August 29, 2005 loss, Dairy American and Gallagher had received the binder but not the policy.[4]

### Dairy America's Claims

Dairy America proceeds on its third amended complaint ("TAC") to contend that the binder does not exclude "goods in transit at the coverage inception date," that "all 59 loads of powdered milk product are covered by the policy," and that the binder "was the contract in effect" in that the policy had not been

---

[4] As a reminder, NY Marine and Southern Marine note that the policy was sent to Gallagher on August 23, 2005.

delivered at the time of the loss. The TAC alleges a (first) breach of contract cause of action that NY Marine and Southern Marine failed to pay Dairy America for 23 lost powder milk loads to breach the binder. Dairy America seeks to recover $971,980 for the lost 23 loads.

## DISCUSSION
### Summary Judgment Standards

NY Marine and Southern Marine seek summary judgment on Dairy America's breach of contract claim in that there is no coverage for Dairy America goods in transit prior to the policy's August 11, 2005 inception. Dairy America and Gallagher argue that material factual issues arise from the policy's inclusion of the attachment clause to preclude summary judgment.

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(d)(1), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, NY Marine and Southern Marine demonstrate as a matter of law that the binder did not cover the 23 pre-August 11, 2005 transit loads.

**Policy Interpretation And Coverage**

NY Marine and Southern Marine argue that the binder neither expresses an intent to cover goods already in transit nor contradicts the policy. NY Marine and Southern Marine further argue that Dairy America and Gallagher "cannot demonstrate that NY Marine or Southern Marine failed to provide the coverage that was requested by Gallagher" in that "the policy negotiated and purchased by Gallagher on behalf of Dairy America was not intended to cover goods in transit prior to August 11, 2005."

Dairy America contends that the binder "served as temporary evidence of insurance coverage" effective until issuance of the policy. Gallagher argues that NY Marine and Southern Marine are unable to rely on the policy's attachment clause, "a material change to the binder," which Gallagher characterizes as "the operative insuring agreement . . . to extend coverage for the entire loss."

Interpretation of an insurance policy is a question of law when determining whether a particular policy provides coverage. *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370 (1995); *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 818, 274 Cal.Rptr. 820 (1990); *see Marquez Knolls Property Owners Assoc., Inc. v. Executive Risk Indemnity, Inc.*, 153 Cal.App.4th 228, 233-234, 62 Cal.Rptr.3d 510, 515-516 (2007) ("The interpretation of an exclusionary clause is an issue of law subject to this court's independent determination."). The "burden is on the insured to prove that he or she comes within the scope of the basic coverage." *National Auto. & Casualty Ins. Co. v. Stewart*, 223 Cal.App.3d 452, 463, 272 Cal.Rptr. 625 (1990) (citing *Royal Globe Ins. Co. v. Whitaker,* 181 Cal.App.3d 532, 537,

226 Cal.Rptr. 435 (1986)). "[C]ourts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." *Collin v. American Empire Ins. Co.*, 21 Cal.App.4th 787, 803, 26 Cal.Rptr.2d 391 (1994).

"An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." *National Ins. Underwriters v. Carter*, 17 Cal.3d 380, 386, 131 Cal.Rptr. 42 (1976) (quoting *Continental Cas. Co. v. Phoenix Constr. Co.*, 46 Cal.2d 423, 432, 296 P.2d 801 (1956)).

NY Marine and Southern Marine conclude that since the 23 loads of powder milk were in transit at the time of the policy's inception, they are not covered by the policy. Dairy America and Gallagher respond that the coverage afforded during the binder's pendency is what an insured can reasonably expect.

### **Insurer Duties**

NY Marine and Southern Marine argue that neither an insurer nor its agent "has a duty to apprise an insured of availability of protection in addition to that offered in the standard policy either through endorsement or a different form of policy or of the availability of different coverage with other insurers." To support such argument, NY Marine and Southern Marine cite *Pabitzky v. Frager*, 164 Cal.App.3d 401, 403, 210 Cal.Rptr. 426 (1985), where the California Court of Appeal addressed uninsured motorist coverage and explained: "We know of no duty on the part of an insurance broker to do more than to call the attention of his customer to the availability of the statutory provision and, unless expressly told to omit it, to see that the policy complies with the [uninsured motorist] statute." NY Marine and Southern Marine further point to *Gibson v. Gov. Employees Ins. Co.*, 162 Cal.App.3d 441, 452, 208 Cal.Rptr. 511 (1984), where the California Court of Appeal concluded that an insurer does not owe "as a matter of law" a fiduciary duty to insureds "to (1) make available to them a particular kind of insurance, (2) advise them of the availability of such coverage elsewhere in the industry, or (3) advise them of inadequacies in coverage of which plaintiffs should, as reasonable persons, have themselves been aware."

NY Marine and Southern Marine argue that an insurer owes no "duty to an insured to volunteer coverage advice, advise that other coverage is available, advise of alternative forms of insurance, advise as to coverage limits, or volunteer other information about the adequacy of coverage." For this

contention, NY Marine and Southern Marine point to *Fitzpatrick v. Hayes*, 57 Cal.App.4th 916, 927, 67 Cal.Rptr.2d 445 (1997), where the California Court of Appeal explained "as a general proposition, an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage." NY Marine and Southern Marine characterize their relationship with Dairy America as "arms length." An "insured person's initial decision to obtain insurance and the corresponding decision of an insurer to offer coverage remain, at the inception of the contract at least, an arm's length transaction to be governed by traditional standards of freedom to contract." *Gibson*, 162 Cal.App.3d at 448, 208 Cal.Rptr. 511.

NY Marine and Southern Marine rely on their absence of "direct communication" and negotiation with Dairy America regarding its "desire for a specific insurance policy" given that Gallagher "placed" the insurance order, acted for Dairy America and was unable to bind NY Marine. "Put quite simply, insurance brokers, with no binding authority, are not agents of insurance companies, but are rather independent contractors . . ." *Marsh & McLennan of Cal. Inc. v. City of Los Angeles,* 62 Cal.App.3d 108, 118, 132 Cal.Rptr. 796 (1976). "Unlike an agent, a broker does not act for the insurer, and the insurer is not liable for the broker's acts or omissions." *Krumme v. Mercury Ins. Co.,* 123 Cal.App.4th 924, 929, 20 Cal.Rptr.3d 485 (2004).

NY Marine and Southern Marine contend that based on information provided by Gallagher, Southern Marine issued a standard form binder and form policy "which contained standard policy inception language." NY Marine and Southern Marine point out that neither of them knew that the inception language did not satisfy Dairy America's "expectations" and that they lacked an obligation to communicate "proactively" with Dairy America. NY Marine and Southern Marine conclude that there is "no evidence of any breach of duty by Southern Marine or New York Marine."

In apparent response, Dairy America offers coverage expert Mr. Adams opinion that NY Marine and Southern Marine "had an affirmative duty to adequately explain the coverage provided under the policy" and "failed in their duty by either failing to include the attachment language in the Binder, or explain to the insured when coverage attached."

This Court is unclear why NY Marine and Southern Marine address potential fiduciary and related duties, and Dairy America appears to respond, given that Dairy America alleges a single breach

of contract claim against NY Marine and Southern Marine. The gist of the claim is that NY Marine and Southern Marine breached the binder by failing to pay the loss of the 23 loads in transit prior to August 11, 2005. In other words, Dairy America complains that it did not receive coverage for which it is entitled. "This is not a 'failure to recommend more coverage' case; it is a 'failure to deliver the agreed-upon coverage' case." *Desai v. Farmers Ins. Exchange,* 47 Cal.App.4th 1110, 1114, 55 Cal.Rptr.2d 276 (1996). Dairy America's claim is not for breach of fiduciary duty or bad faith.

This Court agrees with NY Marine and Southern Marine, and Dairy America does not appear to claim, that NY Marine and Southern Marine "acted other than a market for ocean cargo coverage." Despite the discussion of meeting Dairy America's expectations, Dairy America's claim against NY Marine and Southern Marine boils down to an arms-length transaction.

### **Binder's Effect**

Insurers issue a "'binder,' also called 'temporary' or 'preliminary' insurance, upon application for insurance or payment of the first premium, which covers the applicant until the insurance company's investigation of his or her insurability can be completed and a policy issued or the risk refused." 1A Couch on Insurance, § 13:1 (2008). The Couch treatise further explains:

> A binder is not an insurance policy, but is generally taken to be a contract providing for interim insurance effective as of the date of the application and terminating at either completion or rejection of the principal policy.
>
> . . . Generally, a binder contemplates a subsequent and more formal agreement, and by its nature incorporates the terms of the prospective policy whether those terms are prescribed by law or are part of the customary policy issued by the insurer. Thus, a binder is a written contract by a duly authorized agent of an insurance company recognizing liability on a forthcoming contract during negotiations for such contract, and assuming that a valid or legally operative binder has been executed, it is immaterial that a loss covered by the binder occurs before the formal policy of insurance is issued. (Footnotes omitted.)

Insurance contracts "sometimes exist in two forms: (1) A preliminary contract intended to protect the applicant pending investigation of the risk by the company or until the policy can be properly issued[; and] (2) [t]he final contract or policy itself." *Parlier Fruit Co. v. Fireman's Fund Ins. Co.*, 151 Cal.App.2d 6, 19-20, 311 P.2d 62 (1957).

NY Marine and Southern Marine note that binders "do not have to be specific" and need not "contain all of the terms of the policy." The California Court of Appeal has explained:

> "'If no preliminary contract would be valid unless it specified minutely the terms to be contained in the policy to be issued, no such contract could ever be made or would ever be of any use. The very reason for sustaining such contracts is, that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted.'"

*Parlier Fruit*, 151 Cal.App.2d at 19, 311 P.2d 62 (quoting *Lumbermen's Mut. Ins. Co. v. Slide Rule & Scale Eng. Co.*, 177 F.2d 305, 308 (1949)).

NY Marine and Southern Marine argue that a binder is subject to a policy's controlling terms. Once again, NY Marine and Southern Marine rely on the California Court of Appeal in *Parlier Fruit*, 151 Cal.App.2d 20, 21, 311 P.2d 62:

> Even where such express language is not employed, the contract is construed as being subject to the terms and conditions of the policy to be issued or of the policy ordinarily used by the company, or, if there is a standard policy in the jurisdiction, according to the terms and conditions of that policy, and it is presumed that the parties contemplated such a policy, containing such conditions and limitations. . . .
>
> . . .
>
> "Where, however, the preliminary oral contract or binding slip does not specify the terms and conditions, it is a general rule that the parties will be presumed to have contemplated a form of policy containing such conditions and limitations as are usual in such cases," . . . not the highest form of coverage which could be obtained but one reasonably suited to plaintiff's situation. (Citation omitted.)

In addition, NY Marine and Southern Marine point to *National Emblem Ins. Co. v. Rios*, 275 Cal.App.2d 70, 76, 79 Cal.Rptr. 583 (1969):

> It has long been recognized that practicality dictates that a temporary insurance binder issued upon an application for insurance cannot contain all of the details and terms of the proposed insurance contract. The imposition of such a requirement would frustrate the beneficial purpose of providing temporary coverage pending consideration of the application and would necessitate the immediate issuance of an entire written policy. . . . Thus, insurance binders are adequate if they indicate the subject matter, the coverage period, the rate and the amount of insurance. . . . Moreover, such binders are governed by the terms, conditions and exclusions customarily contained in the standard policy used by the issuer of the binder and in standard insurance policies used by insurance companies in general for the same or essentially similar coverage.

NY Marine and Southern Marine conclude that when Southern Marine provided the binder to Gallagher, "the parties understood (and the law in California mandates) that the binder is subject to the terms and limitations of the ocean cargo policy that Southern Marine offered to its customers and that the coverage bargained for and provided did not apply to shipments that commenced transit before

13

August 11, 2005." NY Marine and Southern Marine point to an absence of evidence that the 23 pre-August 11, 2005 transit loads were intended to be included under the policy.

There is no dispute that the binder was effective as interim insurance in that NY Marine and Southern Marine covered the loss for 36 post-August 11, 2005 transit loads. The issue is whether the binder's scope includes the 23 pre-August 11, 2005 transit loads.[5]

Dairy America argues it is entitled to the binder coverage that it reasonably expected, that is, coverage for all loads in transit as of August 11, 2005. "[C]ourts have held that the coverage provided under a temporary contract of insurance 'is that which the ordinary layman, acting in the ordinary course of business, reasonably may expect by virtue of that transaction . . .' – namely, complete and immediate coverage upon payment of the premium." *Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111, 123, 123 Cal.Rptr. 649 (1975) (quoting *Wernecke v. Pacific Fidelity Life Ins. Co.*, 238 Cal.App.2d 884, 887, 48 Cal.Rptr. 251 (1965)). Dairy America argues that it reasonably relied on the binder (without an attachment clause) and that NY Marine and Southern Marine unreasonably expected Dairy America to contemplate that an attachment date would be included in the policy.

Dairy America points to no meaningful authority that it is entitled to rely on its expected coverage. There is no evidence that Dairy America's controller Ms. McAbee or anyone else at Dairy America read the binder. The evidence is that Dairy America relied on Gallagher. In fact, Ms. McAbee declares Dairy America "relied" on Gallagher and NY Marine/Southern Marine "to explain the limitations and exclusions of such coverage." Purported reliance on NY Marine and Southern Marine is misplaced in that Gallagher acted as Dairy America's broker.

Moreover, Dairy America and Gallagher fail to refute NY Marine and Southern Marine's points regarding ocean cargo policies and standard forms. "[B]inders are governed by the terms, conditions and exclusions customarily contained in the standard policy used by the issuer of the binder and in standard insurance policies used by insurance companies in general for the same or essentially similar coverage." *National Emblem*, 275 Cal.App.2d at 76, 79 Cal.Rptr. 583. Dairy America and Gallagher

---

[5] This Court disagrees with Gallagher's characterization that the issue "is whether the policy can materially change the coverage negotiated and afforded under the binder." This Court agrees with Gallagher that "the binder is the operative insuring agreement" and thus its scope is the determining factor.

fail to challenge meaningfully Mr. Fossler's points regarding industry standards and expectations as to ocean cargo policies. Mr. Fossler makes a keen, undisputed observation that the "business and insurance reason and practice of why goods whose transit begins prior to the inception of the policy are not covered within the cargo policy is that the underwriter would never know what goods were in transit or where the transit may have begun." More importantly, as noted by Mr. Fossler, "the underwriter would have no way of knowing whether or not products such milk powder could have been damaged, adulterated, lost, or stolen." Mr. Fossler's uncontradicted points are valid to support that shipments in transit prior to policy inception are "at the risk of the insured's prior insurer or at the insured's own risk." The binder covered the risk it contemplated pursuant to industry standards, not Dairy America's unsubstantiated expectations.

Dairy America's points regarding the "lost or not lost" clause and policy delivery and Gallagher's points regarding reformation are unavailing in light of the binder's effect and industry standards addressed above.

**CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1. GRANTS defendants NY Marine and Southern Marine summary judgment on Dairy America's breach of contract claim; and
2. DIRECTS the clerk to enter judgment against plaintiff Dairy America, Inc. and in favor of defendants New York Marine and General Insurance Company and Crump Insurance Services dba Southern Marine & Aviation Underwriters, Inc.

IT IS SO ORDERED.

Dated:   **June 11, 2009**                              **/s/ Lawrence J. O'Neill**
                                                UNITED STATES DISTRICT JUDGE