# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

DAIRY AMERICA, INC.,

               Plaintiff,

    vs.

NEW YORK MARINE AND GENERAL
INSURANCE COMPANY, et. al,

              Defendants.
                         /

CASE NO. CV F 07-0537 LJO SMS

**ORDER ON MOTION TO STAY**
(Doc. 132.)

## INTRODUCTION

Plaintiff Dairy America, Inc. ("Dairy America") seeks to stay this action during its appeal of summary judgment in favor of defendant cargo insurer and defendant insurance underwriter[1] that Dairy America's cargo loss is uncovered by a binder or policy to defeat Dairy America's breach of contract claim. Defendants, other than Dairy America's insurance broker, oppose a stay due to prejudice to them from further delay and the absence of sufficient grounds to support a stay. This Court considered Dairy America's motion to stay on the record and VACATES the January 5, 2010 hearing, pursuant to Local Rule 230(g). For the reasons discussed below, this Court DENIES a stay of this action.

---

[1] Defendants who were granted summary judgment are insurer New York Marine and General Insurance Company ("NY Marine") and underwriter Crump Insurance Services dba Southern Marine & Aviation Underwriters, Inc. ("Southern Marine").

**BACKGROUND**

**The Parties**

Dairy America, a Fresno corporation, markets and sells powdered milk products for shipment throughout the United States and foreign countries. Southern Marine is a managing general agent for cargo insurer NY Marine and is authorized as an underwriter to assess risks and bind NY Marine for ocean cargo insurance.

Defendant Arthur J. Gallagher & Co. ("Gallagher") is Dairy America's commercial insurance broker. Southern Marine is not a direct writer of insurance and places insurance through a broker like Gallagher.

Defendant Hartford Casualty Insurance Company ("Hartford") issued a property choice policy ("Hartford policy") to Dairy America. Summary judgment for NY Marine and Southern Marine did not address the Hartford policy or Dairy America's professional negligence claims against Gallagher, which are the subject of Dairy America's independent claims.

**Ocean Cargo Binder**

On August 11, 2005 after negotiation with Gallagher, Southern Marine for NY Marine issued to Dairy America a 20-page binder ("binder") for an ocean cargo policy. The binder identifies insured property as:

> LAWFUL GOODS AND/OR MERCHANDISE CONSISTING PRINCIPALLY OF, BUT NOT LIMITED TO, MILK POWDER OF EVERY KIND AND DESCRIPTION AND OTHER GOODS INCIDENTAL TO THE BUSINESS OF THE ASSURED SHIPPED BREAK-BULK AND/OR CONTAINERIZED FORM . . . AND/OR ALL OTHER INTERESTS HANDLED BY THE ASSURED IN THE COURSE OF THEIR BUSINESS AND/OR IN THE CARE, CUSTODY AND CONTROL OF THE ASSURED WHETHER IN TRANSIT OR STORE OR ELSEWHERE ANYWHERE IN THE WORLD . . . (Uppercase in original.)

The binder provided that coverage is "BOUND WITH EFFECT FROM AUGUST 11, 2005 TO EXPIRE OCTOBER 1, 2006, BOTH DAYS AT 12:01 A.M. LOCAL STANDARD TIME AT THE PLACE OF ISSUANCE, OCEAN CARGO/STOCK THROUGHPUT COVERAGE SUBJECT TO THE FOLLOWING RATES, PREMIUMS, POLICY TERMS, INSURING CONDITIONS AND LIMITS OF LIABILITY." (Uppercase in original.)

The binder included a "lost or not lost" clause which states in pertinent part:

2

1    5.    GEOGRAPHICAL LIMITS:

2    LOST OR NOT LOST, FROM PORTS AND/OR PLACES IN THE WORLD TO
     PORTS AND/OR PLACES IN THE WORLD DIRECTLY OR VIA PORTS AND/OR
3    PLACES IN ANY ORDER, INCLUDING THE RISK OF TRANSSHIPMENT BY
     LAND, AIR OR WATER AND INCLUDING WHILE IN STORAGE WORLDWIDE
4    ASHORE OR AFLOAT. THIS INSURANCE SPECIFICALLY COVERS SHIPMENTS
     BOTH ORIGINATING AND TERMINATING ON LAND WITHIN ANY COUNTRY
5    OR CONTINENT ANYWHERE IN THE WORLD.
            . . .
6
     THE INSURANCE ATTACHES FROM THE TIME THE SUBJECT MATTER
7    BECOMES AT THE INSURED'S RISK OR THE INSURED ASSUMES INTEREST
     OR THE INSURED IS OBLIGATED TO INSURE AND CONTINUES WHILE HELD
8    AS STOCK . . . WHETHER OR NOT IN THE COURSE OF TRANSIT . . .

9    On August 23, 2005, the ocean cargo policy ("cargo policy") issued to Dairy America and was

10   sent directly to Gallagher.  The cargo policy included the following attachment clause ("attachment

11   clause"):  "This insurance attaches to all shipments commencing on or after August 11, 2005 and prior

12   to October 1, 2006, both days at 12:01 A.M. local standard time at place of insurance."  The binder

13   lacked such an attachment clause to limit coverage to shipments commencing on or after August 11,

14   2005.

15                              **Hurricane Katrina Loss**

16        Dairy America assembled several dozen loads of milk powder for shipment to Havana, Cuba.

17   The loads were to be consolidated at a warehouse in Gulf Port, Mississippi and sent to their final

18   destination.

19        On August 29, 2005, 59 loads of the milk powder located in the Gulfport, Mississippi warehouse

20   and awaiting shipment were destroyed by a tidal wave/surge caused by Hurricane Katrina.  The 59 loads

21   comprised 36 loads that had been shipped after the August 11, 2005 cargo policy coverage inception and

22   23 loads shipped prior to August 11, 2005.

23        Dairy America claims that based on the binder, it understood that all of its "shipments whether

24   in transit or in storage were covered from the insurance inception date."  Gallagher, for Dairy America,

25   presented a claim to Southern Marine for the 59 lost loads.  NY Marine's investigation concluded that

26   23 loads were not covered in that the loads' transit preceded the cargo policy's inception.  NY Marine

27   paid Dairy America $1,511,360 for 36 loads which began transit after the cargo policy's inception.

28   Dairy America's claim for the 23 pre-cargo policy inception loads is $971,980.

1   Hartford invoked a flood exclusion to deny Dairy America's claims under the Hartford policy

2   in that a wave created a non-covered loss.

3   **Arrangement Of The Binder And Cargo Policy**

4   In underwriting and placing the cargo policy, Southern Marine senior vice president and

5   underwriter Andrew Fossler ("Mr. Fossler") evaluated the risk, assessed the premium, and established

6   insuring terms and conditions.  Mr. Fossler used what he characterizes as a standard cargo policy which

7   included a standard CAR-000 form declaration section and standard CAR-001 form standard policy

8   language.  NY Marine and Southern Marine characterize the cargo policy as "a standard ocean cargo

9   form which Southern Marine has used with insureds of Gallagher since 1999."

10   According to Southern Marine, in all its dealings with Gallagher involving issuance of cargo

11   policies, "a binder was issued."  Mr. Fossler describes a binder as a "snapshot of the final policy" and

12   explains that a binder "establishes that coverage is in force subject to basic insurance terms."

13   Insurance coverage attorney Erwin Adler ("Mr. Adler") filed a declaration for Gallagher to

14   dispute that a binder is a "snapshot" of a final policy.  Mr. Adler declares that a "binder establishes the

15   coverage described in the binder is in force and will cover the insured on the terms stated."  Mr. Adler

16   characterizes a binder as "a valid and enforceable contract of insurance" that "sets forth the material

17   terms of the policy" which supersedes the binder "only if the policy contains the same terms and

18   conditions as the binder."

19   In his declaration, Dairy America insurance coverage expert John R. Adams ("Mr. Adams"), a

20   marine and surplus lines insurance executive, characterizes the binder "as temporary evidence of the

21   insurance coverage" issued by NY Marine/Southern Marine.

22   **Ocean Cargo Insurance Practices**

23   According to Southern Marine's Mr. Fossler, standard practice for ocean cargo insurance is that

24   goods in transit at the time of a policy's inception are not covered by the policy.  In his declaration, Mr.

25   Fossler explains:

26   > The business and insurance reason and practice of why goods whose transit
   > begins prior to the inception of the policy are not covered within the cargo policy is that

27   > the underwriter would never know what goods were in transit or where the transit may
   > have begun.  Further, the underwriter would have no way of knowing whether or not

28   > products such as milk powder could have been damaged, adulterated, lost, or stolen.

4

1    Finally, there would never have been a way for the underwriter to charge a premium for
     the risk they [sic] have taken.

2
                . . .
3
                . . . If the shipment date on a bill of lading is prior to the inception date on the
4    policy, the cargo is at risk of the insured's prior insurer or at the insured's own risk.

5    Mr. Adler disagrees with Mr. Fossler and opines:

6    The binder demonstrates that New York Marine issued the throughput policy to cover
     all damage to all of Dairy America's goods, whether in transit or not, as to which New
7    York Marine had assumed the risk of loss which would be damaged during the policy
     period.  The binder did not set forth any limits as to coverage based upon the date of
8    shipment.

9               . . .

10              Had New York Marine intended to issue a claims-made type of policy, the binder
     should have set forth a retroactive date.  Like most other insurance policies (and their
11   binders), this binder did not include any such date.

12       As of the August 29, 2005 loss, Dairy American and Gallagher had received the binder but not

13   the cargo policy.[2]

14                                  **Dairy America's Claims**

15       Dairy America proceeds on its third amended complaint ("TAC") to contend that the binder does

16   not exclude "goods in transit at the coverage inception date," that "all 59 loads of powdered milk product

17   are covered by the policy," and that the binder "was the contract in effect" in that the cargo policy had

18   not been delivered at the time of the loss.  The TAC alleges a breach of contract cause of action that NY

19   Marine and Southern Marine failed to pay Dairy America for 23 lost powder milk loads to breach the

20   binder.  Dairy America seeks to recover $971,980 for the lost 23 loads.

21       The TAC alleges against Gallagher:

22       1.      A negligent misrepresentation claim that Gallagher misrepresented that it "would procure

23               additional coverage for all of Plaintiff [sic] shipments of powdered milk";

24       2.      A professional negligence claim that Gallagher breached it duty of care to Dairy America

25               "by failing to obtain coverage for all of Plaintiff's shipments, namely, for shipments of

26               milk product already in transit at the inception of coverage and/or failing to explain to

27
     ───────────────
28       [2]    As a reminder, NY Marine and Southern Marine note that the cargo policy was sent to Gallagher on August
     23, 2005.

                                              5

1    Plaintiff that the policy obtained excluded such risks"; and

2    3.    A breach of oral contract claim that Gallagher breached obligations under an oral

3    contract by failing "to procure additional insurance for Plaintiff, specifically, a marine

4    cargo/stock throughput policy covering all of Plaintiff's shipments."

5    The TAC alleges that Hartford breached the Hartford policy and committed insurance bad faith

6    by refusing to pay for the 23 lost powdered milk loads.

7    **<u>Summary Judgment For NY Marine And Southern Marine</u>**

8    NY Marine and Southern Marine sought summary judgment that the attachment clause barred

9    coverage for shipments in transit prior to the cargo policy's August 11, 2005 inception in that the binder

10   neither expresses an intent to cover goods already in transit nor contradicts the cargo policy.  This Court

11   identified the key issue as "whether the binder's scope includes the 23 pre-August 11, 2005 transit

12   loads."  Relying on cargo insurance points raised by Southern Marine's Mr. Fossler, this Court granted

13   NY Marine and Southern Marine summary judgment and concluded that shipments in transit prior to

14   cargo policy inception were at Dairy America's risk and that the declarations of Dairy America and

15   Gallagher's experts raised no factual issues to defeat summary judgment.

16   This Court denied Dairy America reconsideration of summary judgment for NY Marine and

17   Southern Marine.

18   This Court granted Dairy America relief to seek an immediate appeal of the summary judgment

19   for NY Marine and Southern Marine.[3]  In seeking such relief, Dairy America argued that its claims

20   against NY Marine and Southern Marine are distinct from its claims against Gallagher and Hartford.

21   Dairy America's appeal was recently processed and is in initial filing stage before the Ninth Circuit

22   Court of Appeals.

23   **<u>Status Of This Action</u>**

24   Dairy America's claims against Gallagher and Hartford remain pending before this Court.

25   Upcoming dates include:

26

27   [3]    This Court's order granting Dairy America an immediate appeal of summary judgment noted that Dairy
America's breach of insurance contract claim against NY Marine and Southern Marine "is unique to those parties and does
not directly affect the other parties in that legal issues and factual issues surrounding the claim are dissimilar to Dairy

28   America's claim against the other defendants."

6

1.      A December 18, 2009 non-expert discovery cutoff;

2.      A January 15, 2010 expert disclosure;

3.      An April 23, 2010 expert discovery cutoff;

4.      A May 10, 2010 settlement conference;

5.      A June 25, 2010 dispositive motion hearing deadline;

6.      A July 15, 2010 pretrial conference; and

7.      An August 31, 2010 jury trial.

## DISCUSSION

Dairy America seeks to stay this action, that is, its claims against Gallagher and Hartford, on grounds that it is likely to prevail on its appeal and will suffer "irreparable injury" if required to conduct separate trials on its claims against Gallagher and Hartford, on one hand, and NY Marine and Southern Marine, on the other hand.  Dairy America argues that its claims against NY Marine, Southern Marine and Gallagher are related in that if NY Marine and Southern Marine breached the "contract of insurance with Dairy America," its claims against Gallagher "would be likely moot."

Gallagher joins in Dairy America's motion to stay and points out that without a stay, settlement among Dairy America, Gallagher and Hartford is unrealistic given the uncertainty of NY Marine and Southern Marine's potential liability.

NY Marine and Southern Marine oppose a stay in that Dairy America contradicts its position to seek an immediate appeal and argues that its claims against all defendants are "largely duplicative." Hartford opposes a stay in that further delay subjects it to increased interest on a potential judgment against it.

### Stay Factors

A district court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North American Co.*, 299 U.S. 248, 254-255, 57 S.Ct. 163 (1936).   "The power to stay proceedings is incidental to the power inherent in every court to schedule disposition of the cases on its docket so as to promote fair and efficient

adjudication. How this can best be done is a decision properly vested in the trial courts." *Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1077 (3rd Cir. 1983).

Factors "regulating the issuance of a stay" include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113 (1987). Nonetheless, "[s]ince the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." *Hilton*, 481 U.S. at 777, 107 S.Ct. 2113. A "party seeking a stay may be entitled to prevail if it can demonstrate a 'substantial case on the merits' and the second [irreparable injury] and fourth [public interest] factors militate in its favor." *Natural Resources Defense Council, Inc. v. Winter*, 502 F.3d 859, 863 (9th Cir. 2007).

As fellow district court summarized: "Whether or not to grant a stay is within the court's discretion and it is appropriate when it serves the interests of judicial economy and efficiency." *Rivers v. Walt Disney Co.*, 980 F.Supp. 1358, 1360 (C.D. 1997).

## **Merits**

Dairy America claims it "is likely to prevail on the merits" on appeal. Dairy America notes that interpretation of its "contract for insurance" is reviewed de novo. "The interpretation of a contract presents a mixed question of fact and law subject to de novo review." *Hanson by and through Hanson v. Prudential Ins. Co. of America*, 783 F.2d 762, 764 (9th Cir. 1985). Dairy America argues that its "contract for insurance" is ambiguous on its fact to create a material issue of fact for trial. "When the meaning of an agreement is ambiguous on its face and contrary inferences as to intent are possible, an issue of material fact exists for which summary judgment ordinarily is inappropriate." *International Brotherhood of Elec. Workers, AFL-CIO Local 47 v. So. Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir. 1989).

According to Dairy America, the binder and cargo policy "create ambiguity because they contain mutually conflicting terms." Dairy America notes that the binder lacked the cargo policy's attachment clause to limit coverage to shipments commencing on or after coverage inception. Dairy America argues that the cargo policy's attachment clause's exclusion of coverage for "shipments in transit" is

1  "irreconcilable" with the cargo policy's "lost or not lost" clause[4] which evidences "intent to include

2  shipments already in transit but not yet declared."

3      Dairy America further challenges this Court's handling of the parties' competing expert opinions

4  on application of the binder to Dairy America's loss.  Dairy America accuses this Court of "weighing

5  the opinions."  Dairy America argues that the opinions of its Mr. Adams and Gallagher's Mr. Adler

6  "support a verdict for Dairy America because they support the inference that Defendants NY Marine and

7  Southern Marine were obligated" to cover the 23 pre-cargo policy inception loads.

8      Dairy America concludes that "the Binder was the valid contract of insurance in effect at the time

9  of loss, and Dairy America's claim should have been adjusted based on the Binder" to raise triable issues

10  of material fact whether the 23 pre-cargo policy inception loads are "covered."

11      NY Marine and Southern Marine challenge Dairy America to make a "strong showing that it is

12  likely to prevail on the merits of its appeal."  *See Virginia Petroleum Jobbers Ass'n v. Federal Power*

13  *Commission*, 259 F.2d 921, 925 (D.C. Cir. 1958).  NY Marine and Southern Marine point to this Court's

14  careful consideration of the evidence, legal authority and parties' relationships to correctly conclude that

15  "Dairy America offers no meaningful authority that it was entitled to rely on New York Marine or

16  Southern Marine 'to explain the limitations and exclusions of its coverage.'" NY Marine and Southern

17  Marine note that "Dairy America failed to refute New York Marine and Southern Marine's point that

18  binders are governed by terms, conditions and exclusions customarily contained in its standard insurance

19  policies."  Hartford notes the absence of evidence "that this Court abused its discretion in granting

20  summary judgment."

21      Dairy America reiterates its points to oppose summary judgment and to support reconsideration

22  of summary judgment.  The bottom line is that Dairy America is dissatisfied with and disagrees with

23  summary judgment and this Court's analysis to support summary judgment.  This Court is confident in

24  having granted summary judgment despite that Dairy America's appeal and the underlying summary

25  judgment motion raise unsettled issues regarding application and interpretation of a binder and cargo

26  policy.  Dairy America has failed to convince this Court on two prior occasions that Dairy America is

27

28      [4]      The cargo policy includes a "Geographical Limits" provision, the first sentence of which is identical to the binder's corresponding provision.

1    correct.  Dairy America fails again to demonstrate a strong likelihood of success on appeal.  As such,

2    the merits factor weighs in favor to deny a stay.

3                                            **Irreparable Injury**

4           Dairy America equates its potential to prepare for and present two separate trials as irreparable

5    injury.  Dairy America identifies 12 witnesses which it claims would be called at separate trials.  The

6    witnesses include experts, Dairy America and Gallagher executives, and persons who presumably

7    investigated Dairy America's claim.  Dairy America claims that it could needlessly spend resources on

8    expert discovery if its claims against Gallagher are rendered moot with Dairy America's success on

9    appeal.  Dairy America concludes that "there is no compensatory relief available to Dairy America for

10   the resources it will waste in putting on two separate and duplicative trials" in the absence of

11   "reimbursement of this expense from any of the defendants."

12          NY Marine and Southern Marine dispute irreparable harm to Dairy America in that potential

13   separate trials "is at most an economic inconvenience and hardly qualifies as irreparable harm."  NY

14   Marine and Southern Marine point out that separate trials is consistent with "Dairy America's own

15   position in seeking a separate judgment in the first place" from which to appeal.

16          "Mere injuries, however substantial, in terms of money, time and energy necessarily expended

17   in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective

18   relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim

19   of irreparable harm."  *Virginia Petroleum Jobbers*, 259 F.2d at 925.  Moreover, "case management

20   standing alone is not necessarily a sufficient ground to stay proceedings."  *Dependable Highway*

21   *Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007).

22          Although this Court strives to avoid duplicity, the present situation is of Dairy America's own

23   making.  Dairy America chose to pursue distinguishable claims against NY Marine, Southern Marine,

24   Gallagher and Hartford in one action.  Dairy America's failure to consider or to accept the ramifications

25   of summary judgment for NY Marine and Southern Marine does not amount to irreparable harm despite

26   Dairy America's new notion of overlap in its claims against Gallagher, on one hand, and NY Marine and

27   Southern Marine, on the other hand, to require calling identical witnesses in separate trials.  At most,

28   Dairy America points to additional monetary expenditures – its risk when suing multiple defendants.

1  Dairy America's would be success on appeal does not eliminate its claims against Gallagher, especially

2  if the Ninth Circuit finds issues of material fact to require trial.  In other words, Dairy America will need

3  to try its claims against Gallagher sooner or later and potential evidence overlap fails to justify further

4  delay, especially since trial has been pushed back several times already.  Dairy America fails to establish

5  irreparable harm, and such factor weighs in favor to deny a stay.

6  **Substantial Harm To Defendants**

7  Dairy America argues that Gallagher "will have a better defense" if NY Marine and Southern

8  Marine remain in the case in that the negligence claims against Gallagher "arise out of NY Marine and

9  Southern Marine's breach of contract."  Dairy America reiterates that its success on its breach of contract

10  claim against NY Marine and Southern Marine "likely" moots its claims against Gallagher.  As to

11  Hartford, Dairy America merely notes it "will not suffer any prejudice if made to wait until resolution

12  of the appeal."

13  Hartford faults Dairy America's request for an "indefinite stay" which if granted, would subject

14  Hartford to "tens of thousands of dollars" in "additional interest at 10 percent per annum" for a contract

15  damages judgment favorable to Dairy America to "drastically increase the potential damages owed" to

16  Dairy America.  Hartford concludes that a stay will cause it "severe" economic damage.  Hartford further

17  notes that it "should not be punished due to NY Marine and Southern Marine's success on summarily

18  adjudicating the claim against them."

19  Dairy America responds that since Hartford earns interest on money to be used to pay a

20  judgment, "accrued interest will not come out of its pocket, but out of the interest that has accrued from

21  the time of damage to the time of judgment."

22  NY Marine and Southern Marine note Dairy America's claims against them are "simple and

23  straight forward."  NY Marine and Southern Marine argue that with a stay and joint trial, they "would

24  be dragged into a trial involving professional negligence claims" against Gallagher and would face a

25  "lengthier, costlier trial involving numerous witnesses and much evidence surrounding factual issues"

26  as to Gallagher's professional negligence.

27  A court must consider whether "issuance of a stay substantially harms other parties interested

28  in the proceedings."  *Virginia Petroleum Jobbers*, 259 F.2d at 925.  "'[I]f there is even a fair possibility

11

1   that the stay . . . will work damage to some one else,' the stay may be inappropriate absent a showing

2   by the moving party of 'hardship or inequity.'" *Dependable Highway Express*, 498 F.3d at 1066 (quoting

3   *Landis*, 299 U.S. at 255, 57 S.Ct. 163.

4        The key potential harm to Gallagher and Hartford is delay.  Non-expert discovery has concluded,

5   and expert discovery will soon start.  Trial is set for August 31, 2010.  This Court estimates that the

6   appeal will require no less than 18 months to complete.  If so, a stay would effectively delay remaining

7   matters in this action up to a year or more, depending on this Court's schedule which cannot be predicted

8   at this point.  This Court abhors delay, and the substantial harm to defendants factor weighs against a

9   stay, especially since this action has been pending since February 2007.

10        Moreover, NY Marine and Southern Marine's points as to increased costs cannot be ignored and

11   further support denial of stay.

12                           **Public Interest**

13        Dairy America argues that this case "deals with important issues of insurance coverage and

14   representations to the insured."  Dairy America points to the issue "whether the insured party is covered

15   by what is represented in the Binder before the policy is a matter of strong public interest."

16        This action addresses unique cargo insurance of which the general public may lack interest.

17   Based on the circumstances of this case, the issues do not appear to govern the entire insurance industry.

18   Limited public interest in the issues on appeal does not outweigh the other issues to deny a stay.

19                       **CONCLUSION AND ORDER**

20        For the reasons discussed above, this Court DENIES a stay of this action.

21

22

23

24   IT IS SO ORDERED.

25        **Dated:**    **December 29, 2009**      **/s/ Lawrence J. O'Neill**

26                                      UNITED STATES DISTRICT JUDGE

27

28