1

2

3

4

5

6

7                     IN THE UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   DAIRY AMERICA, INC.,                    CASE NO. CV F 07-0537 LJO SMS

11              Plaintiff,                    **DECISION ON DEFENDANT ARTHUR J.
                                             GALLAGHER, INC.'S SUMMARY**
12        vs.                                **JUDGMENT MOTION**
                                             (Doc. 146.)
13
     NEW YORK MARINE AND GENERAL
14   INSURANCE COMPANY, et. al,

15              Defendants.
                                        /
16

17                            **INTRODUCTION**

18        Defendant insurance broker Arthur J. Gallagher, Inc. ("Gallagher") seeks summary judgment,

19   in absence of necessary elements, on plaintiff Dairy America, Inc.'s ("Dairy America's") negligent

20   misrepresentation, negligence and breach of oral contract claims arising from Dairy America's uninsured

21   cargo loss.  Dairy America responds that Gallagher fails to negate elements of its claims given existence

22   of triable issues of material fact whether Gallagher misrepresented the scope of policy coverage which

23   Gallagher obtained for Dairy America.  This Court considered Gallagher's summary judgment motion

24   on the record[1] and VACATES the April 14, 2010 hearing, pursuant to Local Rule 230(g).  For the

25   _____

26        [1]        This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
     statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
27   to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
     document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
28   material and appropriate for summary judgment.  This Court does not rule on objections in a summary judgment context.

                                         1

1  reasons discussed below, this Court GRANTS Gallagher summary judgment.

2  **BACKGROUND**

3  **The Parties**

4  Dairy America, a Fresno corporation, markets and sells powder milk products for shipment

5  throughout the United States and foreign countries.

6  Gallagher has been Dairy America's commercial insurance broker since 1999.

7  Former defendant New York Marine and General Insurance Company ("NY Marine") is a cargo

8  insurer.  Former defendant Crump Insurance Services dba Southern Marine & Aviation Underwriters,

9  Inc. ("Southern Marine"), is NY Marine's managing general agent and authorized underwriter to assess

10 risks and bind NY Marine for ocean cargo insurance.[2]

11 Defendant Hartford Casualty Insurance Company ("Hartford") issued to Dairy America a

12 property choice policy ("Hartford policy") and denied Dairy America's claim under the Hartford policy.

13 **Obtaining Ocean Cargo Insurance**

14 Beginning in 2000, Gallagher approached Dairy America to obtain ocean cargo insurance in that

15 Dairy America increased overseas shipments.  In her declaration, Dairy America Comptroller Jean

16 McAbee ("Ms. McAbee")[3] states that in 2004, she discussed with then Gallagher Account Executive

17 Ellen Jolley ("Ms. Jolley")[4] "Dairy America's desire to obtain an insurance policy that would cover all

18 of Dairy America's shipments regardless of whether the shipments were in transit or in storage.  Ellen

19 Jolley advised me that an Ocean Cargo/Stock Throughput policy would cover all of Dairy America's

20 shipments."

21 In October 2004, Ms. McAbee sent Gallagher a letter to express interest to obtain an ocean

22 cargo/stock throughput policy.  In her November 19, 2004 letter to Ms. McAbee, Ms. Jolley stated: "I

23

24 ───────────────

25

26 [2]     This Court granted NY Marine and Southern Marine granted summary judgment on Dairy America's sole breach of insurance contract claim against them.  Dairy America appealed the summary judgment decision.

27 [3]     Ms. McAbee has been Gallagher's "primary" contact on insurance matters.

28 [4]     Ms. Jolley currently is a Gallagher Account Executive and Area Assistant Vice President.

am pleased to present our Stock Throughput policy which would cover your stock (powdered milk, etc) in warehouses, land transit and overseas cargo. . . . The policy being proposed offers very broad coverage and one I think you should consider due to the amount of product you are storing monthly and the amount going overseas."

With her December 7, 2004 letter to Ms. Jolley and Gallagher Producer, Account Executive and Team Leader Dennis Olsen ("Mr. Olsen"), Ms. McAbee noted:

> We are currently moving increasing amounts by vessel.  Additionally, we have had opportunities to buy, hold and resell powder.  Thus, the current discussion Ellen and I have had regarding some type of global insurance coverage.
> . . .
> My initial thought is to consider coverage for all product regardless of whether it transfers title at the plant, at the border, over the rail, or at a destination.

In 2005, Dairy America decided to obtain an ocean cargo/stock throughput policy for the first time. Dairy America claims it was "unfamiliar" with such insurance and relied on Gallagher "to explain the limitations and exclusions of such coverage." Ms. McAbee declares: "I requested from Gallagher, and understood I was purchasing, an insurance policy to cover all its [Dairy America's] products whether shipped prior to the inception of the policy or after, wherever they were located and whether in transit or in storage."

Gallagher notes that Dairy America originally intended the ocean cargo coverage to commence on October 1, 2005 when other Dairy America policies expired but that Ms. Jolley convinced Dairy America to commence coverage earlier. On August 11, 2005 after negotiation with Gallagher, Southern Marine for NY Marine issued to Dairy America a binder ("binder") for an ocean cargo policy.  On August 23, 2005, the NY Marine ocean cargo policy ("NY Marine policy") issued to Dairy America and was sent directly to Gallagher.  Dairy America paid a $150,000 annual premium for the NY Marine policy.

**Discussions As To Coverage For Goods In Transit**

As to discussions with Gallagher, Ms. McAbee declares:

> At no time did anyone at Gallagher inform me that the Ocean Cargo/Stock Throughput policy would only cover shipments that were made after the inception of the policy and that any shipments that had been made by Dairy America prior to the inception of the policy would not be covered.  In fact, Gallagher, through Ms. Jolley and Mr. Olsen, represented to me that the Stock Throughput policy would cover all of Dairy

3

1   America's product, which to my understanding included product in transit at the time of
2   the policy's inception.

            . . .

4       Neither Ellen Jolley, nor anyone else from Gallagher explained to me that the
    insurance coverage Dairy America was purchasing was limited to shipments that
5   commenced after the effective date of coverage. I thought that on the effective date, all
    shipments whether in transit or in storage were covered.

6       In their declarations, Mr. Olsen and Ms. Jolley each state: "At no point did Jean McAbee, or any

7   other representative of Dairy America tell me that Dairy America wanted an insurance policy to cover

8   shipments which originated before the policy's commencement date." In her deposition, Ms. Jolley

9   noted that, prior to the binder's inception, she did not have discussions with Ms. McAbee regarding

10  goods already in transit or if they were covered. Ms. Jolley understood that shipments leaving Dairy

11  America's factory or storage facilities prior to the NY Marine policy's August 11, 2005 inception would

12  not be covered by the NY Marine policy and that Dairy America had separate coverage for goods in

13  transit prior to August 11, 2005.

14                          **Hurricane Katrina Loss**

15      Dairy America assembled several dozen loads of milk powder for shipment to Havana, Cuba.

16  The loads were to be consolidated at a warehouse in Gulfport, Mississippi and sent to their final

17  destination.

18      On August 29, 2005, 59 loads of the milk powder located in the Gulfport, Mississippi warehouse

19  and awaiting shipment were destroyed by Hurricane Katrina. The 59 loads comprised 36 loads that had

20  been shipped after the August 11, 2005 NY Marine policy inception and 23 loads shipped prior to

21  August 11, 2005.[5]

22      Dairy America lacked knowledge that its milk powder was stored in the warehouse at the time

23  of Hurricane Katrina. Ms. McAbee testified:

24      I had no knowledge that I had Gulfport that was stored – I had no knowledge –
        well, I had product going to lots of ports. I had no knowledge that there was product in
25      Gulfport that might have been in a warehouse that I might have been needing to cover
        as inventory because it would have been considered not transit.

26

27  _____

28      [5]     Dairy America provided bills of lading to indicate that 23 loads of non-fat powder milk began transit prior
    to August 11, 2005. At the time of the loss, Dairy had received from Gallagher the binder but not the NY Marine policy.

                                    4

Gallagher, for Dairy America, presented a claim to Southern Marine for the 59 lost loads. NY Marine's investigation concluded that 23 loads were not covered in that the loads' transit preceded the NY Marine policy's inception. NY Marine paid Dairy America $1,511,360 for 36 loads which began transit after the NY Marine policy's inception. Dairy America's claim for the 23 pre-NY Marine policy inception loads is $971,980.

Based on Ms. Jolley's deposition testimony, Dairy America attributes to Ms. Jolley her understanding that Dairy American requested coverage for pre-NY Marine policy inception shipments:

> Q.      . . . Did you understand Jean's request for coverage to be all-inclusive, shipments originating preinception of the policy, so that once the policy started, it covered all her product regardless of whether or not it was in transit or in store?
>
> A.      I could only assume that was her intent.

Gallagher takes the position that had it not arranged for the NY Marine policy in August 2005, none of Dairy America's loss would have been covered. Ms. McAbee claims that had she known that the 23 pre-NY Marine policy inception loads were not covered by the NY Marine policy, she "would have determined exactly what product was at risk that was not covered" and "either requested additional coverage from" NY Marine or Southern Marine or "if necessary, would have looked for other insurers to obtain insurance coverage for that product."

**Dairy America's Expert Opinion**

As to insurance broker standard of care, Dairy America offers the declaration of Donald Way ("Mr. Way"), a property casualty underwriter, associate in risk management, and insurance consultant with more than 40 years experience. Mr. Way explains that the NY Marine policy "is an ocean marine open cargo policy" which "only covers shipments commencing within the term of the policy" and "covers only shipments originating during the coverage term, regardless of when the loss occurred. This type of limitation is found only in marine policies."

Mr. Way analogizes an ocean marine open cargo policy to a "claims made policy" which "covers occurrences that are claimed within the policy term, no matter the date of the occurrence" unlike an occurrence policy "which covers losses which occur during the term of the policy."

Mr. Way opines that:

1.      "A reasonable marine insurance broker would have explained the uniqueness of the

1    ocean marine open cargo policy to Dairy America because such a term is contrary to the

2    expectations of clients";

3    2.    "Any reasonable insurance broker in industry custom and practice, in order to meet the

4         standard of care, explains to his client the difference between a Claims-Made policy and

5         an Occurrence policy when selling a Claims-Made policy. Similarly, the standard of care

6         requires an explanation of policy limitations when selling an ocean marine open cargo

7         policy";

8    3.    "Gallagher knew or should have known Dairy America's business practices by 2005, and

9         should have asked the necessary questions to obtain the requested insurance coverage"; and

10

11   4.    "It is possible to obtain coverage under an ocean marine open cargo policy for shipments

12        originating prior to the inception date of the policy. A broker would have to inform the

13        underwriter to obtain coverage and provide supplemental information, and perhaps agree

14        to an additional premium. Gallagher failed to do this."

15                        **Dairy America's Claims Against Gallagher**

16        Dairy America proceeds on its third amended complaint ("TAC") to allege against Gallagher

17   negligent misrepresentation, professional negligence and breach of oral contract claims. The TAC

18   alleges that Gallagher:

19   1.    "[E]ncouraged Plaintiff to obtain additional insurance coverage over and above that

20        coverage provided by the Hartford Policy by recommending that Plaintiff purchase an

21        ocean cargo/stock throughput insurance policy";

22   2.    "[R]ecommended the additional coverage to protect Plaintiff's shipments from risk of

23        loss which might exceed the coverage limits of its existing Hartford insurance policy";

24   3.    "[K]new the risks involved in Plaintiff's business including Plaintiff's concerns

25        regarding coverage, and that all product be covered, including product currently in transit

26        at the time of the request"; and

27   4.    "[A]greed to obtain the requested insurance for Plaintiff."

28        The TAC alleges that Dairy America "expressed to Defendant Gallagher that it wanted the

                                          6

additional coverage for *all* its shipments" and "relied on Defendant Gallagher's knowledge and sophistication to obtain coverage adequate for Plaintiff's shipments of milk products." (Italics in original.)

The TAC's (second) negligent misrepresentation claim alleges that "Gallagher misrepresented to Plaintiff that it would procure additional coverage for all of Plaintiff [sic] shipments of powdered milk." The TAC's (third) professional negligence claim alleges that Gallagher breached its duty of care "by failing to obtain coverage for all of Plaintiff's shipments, namely, for shipments of milk product already in transit at the inception of coverage and/or failing to explain to Plaintiff that the policy obtained excluded such risks." The TAC's (fourth) breach of oral contract claim alleges that in July or August 2005, Dairy America and Gallagher "entered into an oral contract wherein Defendant Gallagher agreed to procure additional insurance for Plaintiff, specifically, a marine cargo/stock throughput policy covering all of Plaintiff's shipments." The claim further alleges that Gallagher breached the oral contract in that it "failed to procure additional insurance which covered Plaintiff for risk of loss of goods in transit at the inception of the policy, and failed to explain to Plaintiff that such coverage was lacking from the policy procured by it."

Dairy America seeks to recover $971,980 for the lost 23 loads.

## DISCUSSION

### Summary Judgment Motion Standards

Gallagher seeks summary judgment in the absence of "underlying support" for Dairy America's claims which Gallagher characterizes are "founded on the same set of facts, separately couched in different theories." Gallagher seeks summary judgment in that:

1.  Gallagher lacked "a duty to recommend or provide additional insurance to cover the entire Hurricane Katrina loss";

2.  Gallagher breached no duty in that it "secured all insurance coverage possible"; and

3.  No contract existed between Dairy America and Gallagher, "only a request by Dairy America and an agreement by Gallagher to do it's [sic] best to arrange for the most comprehensive coverage for which Dairy America was willing to pay."

Dairy America responds that existence of triable issues of material fact defeats summary

judgment in that Dairy America "requested that all of its product be covered as of the policy inception" and that Gallagher failed "to procure insurance coverage Dairy America requested" and misrepresented to Dairy America that "insurance coverage existed" and that the "policy would cover all of its product, regardless of whether the product was in transit or storage." Dairy America challenges Gallagher's denial of an oral contract in that "[u]nderstanding by both parties of definite terms of the agreement are [sic] all that is needed." Dairy America accuses Gallagher of "trying to hide its negligence in procuring an inadequate policy behind a veil of ignorance."

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.*, 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

1    *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

2            To carry its burden of production on summary judgment, a moving party "must either produce

3    evidence negating an essential element of the nonmoving party's claim or defense or show that the

4    nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

5    persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

6    Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

7    1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

8    court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech

9    Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material.

10   Only disputes over facts that might affect the outcome of the suit under the governing law will properly

11   preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

12           "If a moving party fails to carry its initial burden of production, the nonmoving party has no

13   obligation to produce anything, even if the nonmoving party would have the ultimate burden of

14   persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

15   "If, however, a moving party carries its burden of production, the nonmoving party must produce

16   evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

17   at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

18   fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

19   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

20   summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

21   the showing sufficient to establish the existence of an element essential to that party's case, and on

22   which that party will bear the burden of proof at trial.")

23           "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

24   the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

25   106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough

26   'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

27   *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

28   289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the

1    plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

2        As discussed below, there is an absence of evidence on elements of Dairy America's claims to

3    entitle Gallagher to summary judgment.

4                                    **Professional Negligence**

5        Gallagher identifies the "core allegation" that it "either agreed to provide 'additional coverage

6    for all' of Dairy America's product, or had a legal duty to assure such 'additional coverage.'" Gallagher

7    contends that "existence and breach of a duty is the foundation upon which the entirety of the Dairy

8    America claim exists."   Gallagher concludes that it breached no duty to Dairy America as Dairy

9    America's insurance broker.

10       Dairy America responds that Gallagher owed "a duty to procure full coverage for all of Dairy

11   America's product" and that triable issues of material fact exist as to that duty.

12                                    *Existence Of Duty*

13       "The elements of a cause of action in tort for professional negligence are: (1) the duty of the

14   professional to use such skill, prudence, and diligence as other members of his profession commonly

15   possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent

16   conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's

17   negligence." *Budd v. Nixen,* 6 Cal.3d 195, 200, 491 P.2d 433 (1971).

18       "The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing

19   a claim for negligence." *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal.App.3d 1089, 1095, 283

20   Cal.Rptr. 53 (1991).  "The existence of a duty of care toward an interest of another worthy of legal

21   protection is the essential prerequisite to a negligence cause of action, determined as a matter of law by

22   the court." *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,* 49 Cal.App.4th 472, 478, 56

23   Cal.Rptr.2d 756 (1996) (citing *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 397, 11 Cal.Rptr.2d 51

24   (1992)).  "The existence of a legal duty to use reasonable care in a particular factual situation is a

25   question of law for the court to decide." *Vasquez v. Residential Investments, Inc.,* 118 Cal.App.4th 269,

26   278, 12 Cal.Rptr.3d 846 (2004) (citation omitted).

27                                    *Broker Duties*

28       An insurance agent or broker "assumes only those duties found in any agency relationship such

                                              10

as 'reasonable care, diligence, and judgment in procuring the insurance requested by an insured.'" *Paper Savers, Inc. v. Nacsa*, 51 Cal.App.4th 1090, 1095, 59 Cal.Rptr.2d 547 (1996).  An insurance broker "generally has no duty to volunteer that an insured should obtain different or additional insurance coverage." *Roberts v. Assurance Co. of America*, 163 Cal.App.4th 1398, 1403-1404, 78 Cal.Rptr.3d 361 (2008); *see Paper Savers*, 51 Cal.App.4th at 1096, 59 Cal.Rptr.2d 547 ("an agent has no duty to advise the insured on specific insurance matters").  "The rule changes, however, when – but only when – one of the following three things happens: (a) the agent misrepresents the nature, extent or scope of the coverage being offered or provided . . ., (b) there is a request or inquiry by the insured for a particular type or extent of coverage . . ., or (c) the agent assumes an additional duty by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured." *Fitzpatrick v. Hayes,* 57 Cal.App.4th 916, 927, 67 Cal.Rptr.2d 445 (1997); *Paper Savers*, 51 Cal.App.4th at 1096, 59 Cal.Rptr.2d 547 ("special duty may be created by express agreement or by the agent holding himself out to be more than an 'ordinary agent'").

Nonetheless, the "general duty of reasonable care which an insurance [broker] owes his client does not include the obligation to procure a policy affording the client complete liability protection." *Jones v. Grewe*, 189 Cal.App.3d 950, 956, 234 Cal.Rptr. 717 (1987) ("complaint did not allege the existence of an express agreement creating a broader agency relationship in which [insurance agents] were to advise, suggest and procure for [insureds] liability insurance in an amount sufficient to protect [insureds'] personal assets and satisfy any judgment against [insureds] arising out of the [insureds'] negligent acts").  "The mere allegation in a complaint, as in this case, that an insured has purchased insurance from an insurance agent for several years and followed his advice on certain insurance matters is insufficient to imply the existence of a greater duty. Such reliance is not at all uncommon when an insured has done business with an insurance agency over a period of time." *Jones*, 189 Cal.App.3d at 956, 234 Cal.Rptr. 717.  In addition, "existence of a broader agency relationship warranting the imposition of a greater duty" cannot be "reasonably inferred from the complaint's allegation that [insurance agents] had assured [insureds] of the adequacy of their liability coverage." *Jones*, 189 Cal.App.3d at 956, 234 Cal.Rptr. 717.

"It is the insured's responsibility to advise the agent of the insurance he wants, including the

limits of the policy to be issued. . . . Ordinarily, the person seeking liability insurance knows better than the insurance agent the extent of his personal assets, and the premium he can afford or is willing to pay." *Jones*, 189 Cal.App.3d at 956, 234 Cal.Rptr. 717. "In the absence of an express agreement to ensure adequate coverage or a holding out by the agent to assume greater duties otherwise implied in the agency relationship, the onus is thus squarely on the insured to inform the agent of the insurance he requires." *Paper Savers*, 51 Cal.App.4th at 1096, 59 Cal.Rptr.2d 547.

### *Insured's Request For Coverage*

Gallagher argues that it did not breach even an "enhanced duty" in that:

1.   Dairy America did not "specifically" ask Gallagher to secure a policy covering goods already in transit;

2.   Neither Southern Marine would underwrite nor NY Marine would insure goods in transit prior to NY Marine policy inception;[6] and

3.   Neither Dairy America nor Gallagher knew how many loads were in transit prior to NY Marine policy inception.

Gallagher concludes that it breached no duty by "failure to insure the milk in transit prior to the policy date because such task was impossible – given the information provided by Dairy America and Fossler's criteria to underwrite a policy."

Dairy America responds that Gallagher "owed it an enhanced duty of care" in that "Dairy America expressly requested marine ocean insurance that covered its powdered milk product located anywhere in the world, whether in storage or in transit." Dairy America holds Gallagher to a duty "to obtain insurance to serve Dairy America's express needs" in that "Dairy America made a request for a specific extent of coverage."

---

[6]   Gallagher points to the deposition testimony of Southern Marine Senior Vice President Andrew Fossler ("Mr. Fossler"):

> Q.   . . . Assuming that a broker had goods in transit that – that he determined was not covered, assuming that that was the situation, from your end, how would you handle that if it was asked of you, look, I've got goods in transit here and I need them covered and we'd like it – we'd like you guys to pick that up? How would you handle that from your end?

> A.   First and foremost, I'd say we would not do it.

Dairy America's initial challenge to summary judgment on its professional negligence claim is that it made a request or inquiry "for a particular type or extent of insurance." *Fitzpatrick*, 57 Cal.App.4th at 927. As such, an issue arises whether Dairy America, more specifically, Ms. McAbee, requested or inquired of coverage for goods in transit at the NY Marine policy's August 11, 2005 inception. Dairy America offers no precise evidence on this issue. According to her declaration, Ms. McAbee in 2004 discussed with Ms. Jolley "Dairy America's desire to obtain an insurance policy that would cover all of Dairy America's shipments regardless of whether the shipments were in transit or in storage." Such a vague reference to a discussion of desire months prior to policy inception does not support a request for coverage of goods in transit at policy inception. Dairy America relies on Ms. Jolley's assumption of Ms. McAbee's intent to cover "her product regardless of whether or not it was in transit or in store." Ms. Jolley's assumption does not translate to Dairy America's request/inquiry as to coverage for goods in transit at policy inception.

In addition, Ms. McAbee's December 7, 2004 letter fails to substantiate a request for coverage of goods in transit at policy inception. Ms. McAbee's December 7, 2004 letter expresses only her "initial thought . . . to consider coverage for all product" months prior to NY Marine policy inception. The letter expresses no more than a concept, not a request for specific coverage. Dairy America points to no specific evidence that Ms. McAbee or anyone else from Dairy America requested coverage for or inquired about coverage for goods in transit prior to NY Marine policy inception.

Ms. McAbee broadly declares that she "requested coverage from Gallagher, and understood I was purchasing, an insurance policy to cover all its products whether shipped prior to the inception of the policy or after, wherever they were located and whether in transit or in storage." However, Dairy America fails to identify such request. There is no writing to support such a broad request. Ms. McAbee does not identify a particular discussion with Ms. Jolley or Mr. Olsen where she made such request. Dairy America fails to substantiate that such a request was made near the time of policy inception. The record reveals only discussions in 2004, no less than eight months prior to NY Marine policy inception. Ms. McAbee offers no more than a gross generalization without supporting facts. A specific request for pre-policy inception coverage is negated in that Ms. Jolley did not know what goods were in transit at inception of the NY Marine policy.

13

1    Dairy America fails to raise factual issues that Gallagher owed an enhanced duty based on Dairy

2    America's request or inquiry as to coverage for goods in transit prior to NY Marine policy inception.

3    *Misrepresentation Of Coverage*

4    Dairy America argues that Gallagher owed it an enhanced duty in that "Gallagher misrepresented

5    to Dairy America that the stock throughout policy it procured for Dairy America covered all of Dairy

6    America's powdered milk product located everywhere in the world."

7    Gallagher responds that "[t]here are simply no admissible facts to support a misrepresentation

8    by Gallagher."

9    Dairy America points to no specific evidence of Gallagher's representation of coverage for goods

10   in transit prior to NY Marine policy inception.  Ms. McAbee declares that "Ms. Jolley and Mr. Olsen,

11   represented to me that the Stock Throughput policy would cover all of Dairy America's product, which

12   to my understanding included product in transit at the time of the policy's inception."  Ms. McAbee fails

13   to identify the particular representation by Ms. Jolley and Mr. Olsen.  Ms. McAbee's declaration

14   contradicts her deposition testimony in that she did not know of product in the Gulfport warehouse.

15   Neither Dairy America nor Ms. McAbee are able to claim that Gallagher misrepresented that the 23 pre-

16   NY Marine policy inception loads were covered.  Neither Dairy America nor Gallagher knew that the

17   23 loads were in transit.

18   Ms. McAbee's "understanding" of coverage for "product in transit at the time of the policy's

19   inception" does not constitute Gallagher's misrepresentation of coverage for the loads.  Ms. Jolley denies

20   discussion regarding goods already in transit or if they were covered.  Moreover, Gallagher did obtain

21   a policy which covered Dairy America's goods in transit – after inception of the NY policy.  Dairy

22   America fails to raise factual issues that Gallagher misrepresented the nature, extent or scope of

23   coverage.

24   *Procuring Proper Coverage*

25   In an apparent backing away from enhanced duties, Dairy America points to Mr. Way's opinions

26   to argue that Gallagher breached its duty "to procure proper insurance coverage."  Dairy America faults

27   Gallagher's failure "to set forth sufficient evidence that precludes the possibility that Dairy America

28   could have provided any required information to obtain coverage with New York Marine and Southern

14

Marine, or that no other insurer would have provided coverage for shipments in transit on the policy inception date." Dairy America holds Gallagher "to obtain ocean marine insurance for shipments originating prior to the inception date of the policy."

Dairy America appears to equate "proper insurance coverage" with coverage for goods in transit at the NY Marine policy's inception and to contend that Gallagher was required to obtain a "stand alone" NY Marine or other policy for goods in transit at the NY Marine policy's inception. Notwithstanding Mr. Way, Dairy America points to no authority for the extraordinary duties it seeks to impose on Gallagher. As a reminder, an insurance broker "generally has no duty to volunteer that an insured should obtain different or additional insurance coverage." *Roberts*, 163 Cal.App.4th at 1403-1404, 78 Cal.Rptr.3d 361. The evidence suggests that Dairy America relied on the Hartford policy to cover goods in transit prior to inception of the NY Marine policy. Ms. McAbee's December 7, 2004 letter to Gallagher notes:

> My understanding of current coverage in relation to NFDM product is as follows:
> Commerical Package with Hartford –
> Covers any inventory we may have on a monthly reportable basis . . .
> Includes $450,000 transit coverage per claim to insure product traveling with the US for which DA arranged the freight causing title to transfer at the destination, not FOB the plant.

Dairy America offers nothing to substantiate the availability of coverage it claims Gallagher should have obtained and relies on Mr. Way's speculation that "[i]t is possible to obtain coverage under an ocean marien open cargo policy for shipments originating prior to the inception date of the policy." Mr. Way does not identify such coverage or potential insurers or underwriters. The evidence reveals that NY Marine would not provide such coverage in that when the issue was put before Southern Marine's Mr. Fossler, he responded "First and foremost, I'd say we would not do it." Mr. Way's vague criticisms fail to raise genuine issues of material fact that Gallagher breached a duty to procure proper insurance, especially given that without its efforts, Dairy America would have had no coverage for the 36 loads in transit after NY Marine policy inception.

Dairy America fails to raise sufficient factual issues to defeat summary judgment on its professional negligence claim.

/ / /

**Negligent Misrepresentation**

Gallagher argues that Dairy America's negligent misrepresentation claim is an "alternative means" to allege Gallagher's enhanced duty, the premise for all of Dairy America's claims. Gallagher appears to argue that professional negligence claim subsumes the negligent misrepresentation and breach of oral contract claims.

Dairy America responds that Gallagher offers "no competent evidence to demonstrate that Dairy America cannot meet any element of the claim."

The elements of a negligent misrepresentation claim are: (1) a misrepresentation, (2) with no reasonable ground to believe it to be true, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage. *Conroy v. Regents of University of Cal.*, 45 Cal.4th 1244, 1256, 203 P.3d 1127 (2009).

Dairy America relies on the same points it made to attempt to avoid summary judgment on its professional negligence claim. As noted above, no evidence raises sufficient factual issues that Gallagher misrepresented that the 23 pre-NY Marine policy inception loads were covered in that neither Dairy America nor Gallagher knew that the 23 loads were in transit. Despite Dairy America's claim, there is no evidence that Gallagher represented that the NY Marine policy "would cover all of Dairy America's product." Gallagher's forwarding the binder to Dairy America does not constitute Gallagher's representation of coverage given that the binder originated with Southern Marine. There is no evidence that Gallagher drafted the binder. Dairy America's criticisms with the binder are attributable to NY Marine and Southern Marine and have been addressed in summary judgment in their favor. Dairy America fails to raise sufficient factual questions as to elements of its negligent misrepresentation claim.

**Breach Of Oral Contract**

Gallagher argues that its communications with Dairy America did not give rise to an agreement to support Dairy America's breach of oral contract claim in that discussions between or among Ms. McAbee, Ms. Jolley and Mr. Olsen typify those "that take place between any agent and its client and are never considered contractual." Gallagher relies on Ms. McAbee's testimony that she does not recall reference to a "contract" during her discussions with Gallagher and that Ms. McAbee asked Gallagher

16

to use "best efforts" to secure coverage.  Gallagher points to Ms. McAbee's additional testimony:

> Q.     So all of your discussions with Ellen [Jolley] and Dennis [Olsen] were for the purpose of getting enough information on your side, that is in terms of what you thought you were getting and what you were paying, so that you could make a business decision as you had done before; correct?
>
> A.     Correct.

Moreover, as Gallagher notes, Ms. Jolley and Mr. Olsen each declare that "[a]t no time . . . was there ever an agreement, written or oral, that Gallagher would secure total or complete insurance coverage for Dairy America products" or "a representation . . . that Gallagher could or would provide full coverage to Dairy America for its products everywhere in the world."

Dairy America disputes that Gallagher makes a "sufficient factual showing that an oral contract does not exist between it and Dairy America." Dairy America claims formation of an oral contract based on its specific request "that Gallagher procure insurance coverage for all of its products," premium payment, and Gallagher's procurement of "an insurance policy that it believed covered Dairy America's request." Dairy America argues that an oral contract arose in that all "material terms are definitely understood by both sides." *Khajavi v. Feather River Medical Group*, 84 Cal.App.4th 32, 61, 100 Cal.Rptr.2d 627 (2000) ("Negotiations can result in a binding oral contract 'when all of the terms are definitely understood . . .").

Similar to its misrepresentation of coverage claim, Dairy America points to no evidence of Gallagher's oral agreement to procure coverage for goods in transit prior to NY Marine policy inception. Ms. McAbee declares that she understood there would be coverage for "product in transit at the time of the policy's inception." However, Gallagher could not have agreed to procure coverage for the 23 pre-NY Marine policy in transit loads given that Ms. McAbee testified that she did not know of the product in the Gulfport warehouse. Ms. McAbee's understanding does not translate into a bilateral agreement to secure coverage for goods in transit prior to inception of the NY Marine policy. The evidence reveals Gallagher's agreement to procure the NY Marine policy, not to guarantee coverage to the extent claimed by Dairy America. Dairy America fails to raise sufficient factual issues to preclude summary judgment on its breach of oral contract claim.

/ / /

17

**CONCLUSION AND ORDER**

In sum, Dairy America fails to raise sufficient factual issues that it requested ocean cargo coverage other than or in addition to that which Gallagher obtained.  Dairy America pinpoints no specific, timely request for coverage for goods in transit at policy inception.  At most, Dairy America points to initial conceptual discussions for coverage it sought.  The record reveals that based on discussions with Ms. McAbee, Gallagher obtained available coverage to fit Dairy America's needs and desires, taking into context the dealings between Dairy America and Gallagher since 2000 regarding coverage for Dairy America's overseas shipments .  There is no evidence that Dairy America specifically asked for coverage for the 23 pre-NY Marine policy inception loads or whether the loads were covered.  The record reveals there could be no such specific request or inquiry given that Ms. McAbee did not know the location of the loads.  Gallagher obtained a policy which covered goods in transit at policy inception.  As such, this Court:

       1.      GRANTS Gallagher summary judgment; and

       2.      DIRECTS the clerk to enter judgment in favor of defendant Arthur J. Gallagher, Inc. and against plaintiff Dairy America, Inc. in that there is no just reason to delay to enter such judgment given Dairy America's claims against Gallagher and Gallagher's alleged liability are clear and distinct from claims against and liability of other defendants.  *See* F.R.Civ.P. 54(b).

This Court cautions Dairy America not to seek reconsideration based on Dairy America's disagreement with this decision and/or evidentiary and legal points which it has made or was able to make.  *See* 28 U.S.C. § 1927;  *Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996); *Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir.), *cert. denied*, 489 U.S. 1096, 111 S.Ct. 986 (1991); *Erickson v. Newmar Corp*. 87 F.3d 298, 303 (9th Cir. 1996).  This Court has thoroughly reviewed and analyzed the record and legal authorities to support its decision.  This Court reminds Dairy America that reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *See Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2nd Cir. 1998).  "A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the

1    cases and arguments considered by the court before rendering its original decision fails to carry the

2    moving party's burden." *United States v. Westlands Water Dist.,* 134 F.Supp.2d 1111, 1131 (E.D. Cal.

3    2001) (internal citations omitted).

4         IT IS SO ORDERED.

5    **Dated:    April 1, 2010                        /s/ Lawrence J. O'Neill**
                                            UNITED STATES DISTRICT JUDGE

19