1
2
3
4
5
6
7 **IN THE UNITED STATES DISTRICT COURT**

8 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10 DAIRY AMERICA, INC.,                    CASE NO. CV F 07-0537 LJO SKO

11              Plaintiff,                 **DECISION ON HARTFORD'S SUMMARY
                                            JUDGMENT MOTION**
12        vs.                              (Doc. 165.)

13 NEW YORK MARINE AND GENERAL
   INSURANCE COMPANY, et. al,
14
                Defendants.
15 _____/

16                          **INTRODUCTION**

17        Defendant insurer Hartford Casualty Insurance Company ("Hartford") seeks summary judgment

18 that plaintiff Dairy America, Inc.'s ("Dairy America's") insurance coverage claims are barred by Dairy

19 America's failure to satisfy a 24-month limitation provision in Hartford's property policy issued to Dairy

20 America.  Dairy America responds that its claims are timely in that they are subject to a four-year

21 limitations period and to equitable tolling based on misrepresentation or concealment of evidence of the

22 cause of Dairy America's loss.  This Court considered Hartford's summary judgment motion on the

23 record.[1]  For the reasons discussed below, this Court DENIES Hartford summary judgment.

24 _____

25        [1]        This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
   statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
26 to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
   document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
27 material and appropriate for summary judgment.  Unless otherwise noted, this Court does not rule on objections in a summary
   judgment context.
28

                                              1

**BACKGROUND**

**The Parties**

Dairy America, a Fresno corporation, markets and sells powder milk products for shipment throughout the United States and foreign countries.

In late summer or early fall 2004, Hartford issued a Special Multi-Flex Policy ("Hartford policy") to Dairy America with an October 1, 2004 to October 1, 2005 policy period.   Dairy America characterizes the Hartford policy as "general commercial, all-risk" to have insured its powder milk product in transit.

Former defendant New York Marine and General Insurance Company ("NY Marine") is a cargo insurer and in August 2005, issued to Dairy America an Ocean Cargo/Stock Throughput Policy ("NY Marine policy").   Former defendant Crump Insurance Services dba Southern Marine & Aviation Underwriters, Inc. ("Southern Marine"), is NY Marine's managing general agent and authorized underwriter to assess risks and to bind NY Marine for ocean cargo insurance.[2]

Former defendant Arthur J. Gallagher, Inc. ("Gallagher") has been Dairy America's commercial insurance broker since 1999.[3]   Gallagher negotiated to obtain the NY Marine policy for Dairy America.

**Denial Of Hurricane Katrina Loss**

On August 29, 2005, Hurricane Katrina destroyed 59 loads of Dairy America's powder milk product at a Gulfport, Mississippi warehouse.   Dairy America presented claims to Hartford and NY Marine for the 59 loads.[4]   Marine surveyor Stan Kays ("Mr. Kays") was retained by Hartford and NY Marine and concluded in his report that the Dairy America loss was caused by a tidal wave:

> P&O port sheds, located on the West Pier, including the shed where the milk product was stored, were struck by a 25' tidal wave (surge wave) which completely blew out the shed building sides, doors, etc., and/or caused sheds to completely collapse and fall apart.  All cargoes within these sheds including the Milk Powder was [sic] swept/carried away by the aforesaid storm surge.

---

[2]     This Court granted NY Marine and Southern Marine summary judgment on Dairy America's sole breach of insurance contract claim against them.  Dairy America appealed the summary judgment decision.

[3]     This Court granted Gallagher summary judgment on Dairy America's professional negligence and related claims against Gallagher.

[4]     NY Marine paid for the loss of 36 loads which initiated transit after the inception of the NY Marine policy. NY Marine denied coverage for the 23 loads which were in transit prior to inception of the NY Marine policy.

Hartford Senior General Adjuster Michael Spetz' ("Mr. Spetz'") October 19, 2005 letter ("first denial letter") to Dairy America Comptroller Jean McAbee ("Ms. McAbee") denied Dairy America's claim based on a Hartford policy flooding exclusion of the Hartford policy. The first denial letter stated that "[w]e have determined that there would be no coverage for this loss" and referenced a "Flood, Water Under the Ground" exclusion ("flood exclusion").[5] The first denial letter included the Hartford policy's 24-month suit limitation and stated:

> Please be advised that the policy contains the following time limitation:

>> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all requirements of the policy, nor unless commenced within twenty four (24) months next after inception of the loss, unless a longer time is provided by applicable statute.

> This provision has also been held to apply to the presentation of the claim as well as law suits. The time period has been tolled (stopped running) during the handling of the claim. It is Hartford's position that the tolling ends as of the date of this letter.

> By this letter, Hartford Casualty Insurance Company does not waive, nor should it be deemed to have waived, any of its rights or defenses under the terms, conditions, or provisions of the above-referenced policy, or the law, all of which are expressly reserved.[6]

### Further Investigation Into Loss

Gallagher employee Michael Head's ("Mr. Head's") October 24, 2005 email to Mr. Spetz raised

---

[5]   The flood exclusion provides:

a. We will not pay for loss or damage caused by, resulting from, arising out of, or in any way related to:

(1) Flood which means:

(a) Surface water, waves, tidal water, tidal waves, tsunamis, or overflow of any natural or man made body of water from its boundaries, all whether driven by wind or not.

. . .

[6]   Dairy America denies that it could locate the limitations provision quoted in the first denial letter. In its reply papers, Hartford notes that the Hartford policy's "Property Choice Conditions and Definitions" provides: "No one may bring legal action against us under this Coverage Part unless: . . . The action is brought within two years after the date on which the direct physical loss or damage occurred." Despite the absence of clarity, Hartford and Dairy America apply the limitations provision quoted in the first denial letter and agree that the time to sue Hartford started to run initially from the October 19, 2005 first denial letter. As such, this Court will treat as applicable and appearing in the Hartford policy the limitations provision quoted in the first denial letter.

3

wind damage as a cause of Dairy America's loss:

> If The Hartford intends to argue that flood was the sole cause of the insured's loss, I assume that the carrier can provide documentation confirming. Given the magnitude of the storm, it is our position that the warehouse would have first been damaged by wind long before any alleged flood, resulting in a covered loss. . . . Any wind damage to the insured's warehouse would certainly have resulted in damage to the insured's product.

Mr. Spetz followed up with an October 25, 2005 email to surveyor Mr. Kays to ask:

> Did you take any photos of the warehouse area where the insured's product was located? I [sic] there is any chance that the warehouse was damaged by wind and our insured's product or a portion of it was damaged before the storm surge?

Dairy America notes that Mr. Kays forwarded to his supervisor Mr. Spetz' October 25, 2005 email.

Dairy America claims that on October 25, 2005, Mr. Kays first learned which warehouse stored Dairy America's powder milk and took eight photographs of the warehouse. In his deposition, Mr. Kays testified:

> Q.   . . . Prior to the 25th of October, had you determined where the product was stored in Warehouse 16?
>
> A.   No. I was never able to get that information.

Mr. Kays prepared an October 28, 2005 report to advise as to an October 25, 2005 follow-up survey. As to the cause of Dairy America's loss, Mr. Kays' report provided:

> It is our belief and opinion that the extensive water damages sustained to the captioned shipment reportedly stowed in eight (8) ocean containers as well as the greater portion of the shipment stored/staged in stuffing Warehouse No. 16, West Pier, Port Gulfport, Mississippi, resulted from a reported 25' tidal wave (surge wave) associated with Hurricane Katrina passing by and making landfall to the West of Gulfport, Mississippi, on August 29, 2005. In our opinion the reported 25' tidal wave (surge wave) caused the sides of Warehouse No. 16 to be blown out and Powdered Dry Milk cargo to be swept/carried away and damaged.

Dairy America notes that the report neither mentioned investigation into wind damage nor acknowledged Mr. Spetz' October 25, 2005 email inquiry as to wind damage.

Twenty photos were attached to Mr. Kays' October 28, 2005 report. Dairy America notes that one photo depicts "a large patch of sunlight shining down into the warehouse that had stored Dairy America's lost product" and that the photo was not one of three photos which Hartford emailed to Dairy America on November 28, 2005. Dairy America further notes that of the three photos which Hartford emailed to Dairy America, none depicted "sunlight shining down into the warehouse."

4

Pictometry International took a September 9, 2005 aerial photo of the warehouse which stored Dairy America's powder milk product.   According to Dairy America, the photo depicts "an approximately 2,000 square foot hole in the roof of the warehouse in the area where Dairy America's product was stored."   Dairy America notes that Mr. Kays did not take "any direct pictures" of the warehouse roof's large hole and did not note the hole in his reports.

In his deposition, Mr. Spetz explained that Hartford did not "insure the building so I wouldn't be concerned with the roof":

> Q.   But considering that Gallagher had suggested that the wind came up and caused the damage to the product, wouldn't you be then concerned whether the roof was intact?
>
> A.   We went back and spoke to Stan Kays and his conclusion was the same, that there was a storm surge and it was not caused from wind.
>
> Q.   And you testified in your first deposition that the roof was intact, correct?
>
> A.   As far as I know yes, the roof was intact.
>
> . . .
>
> Q.   And did you see any damage in the photographs sent to you by Mr. Kays that was consistent, in your experience, with damage to a structure caused by wind.
>
> A.   I did not.

In his deposition, Mr. Kays noted that he "didn't see the damage to the roof" and "didn't do an investigation of it."   When asked if he did "a visual inspection of inside the building," Mr. Kays responded:

> I really wasn't there for the building.  I was there looking for the cargo or evidence that the cargo was there.  I was looking for damaged cargo.  The building was incidental, in that this is where the cargo was housed.  I didn't know it would be an issue later.
>
> . . .
>
> . . . Everything was flushed, in my opinion, out of the warehouse due to wave and surge action.

Dairy America notes the opinion of Hartford expert engineer David Vanderostyne ("Mr. Vanderostyne") that the warehouse roof "failed due to wind . . . during the peak of the storm."  Hartford points out that Mr. Vanderostyne concluded that peak winds hit the warehouse after "a significant amount of water penetrated the warehouse . . . to start damaging the product."

**Reconsideration Of Denial**

In March 2006, Gallagher and Dairy America's counsel Glenn Holder ("Mr. Holder") requested reconsideration of denial in that wind prior to flooding may have contributed to the loss. Mr. Spetz' April 24, 2006 letter ("reopening letter") to Mr. Holder stated that "[w]e have reopened our investigation into this claim" and continued:

> Although we are reopening our investigation, at the present time, our position remains as stated in our October 19, 2005 letter. This letter should not be construed as a waiver of any of Hartford Casualty Insurance Company's rights under the policy or at law. We will, however, agree that the insured's time to file suit, per the policy's limitation clause, will begin to toll again from the date of this letter until further notice.

In his declaration, Mr. Spetz notes that he requested "all such evidence" of pre-flooding wind damage and that "[n]o evidence of wind damage was ever submitted by or on behalf of DAIRY. Having received no evidence to support the theories . . ., the decision to reaffirm the denial was determined."

Relying only on the declaration of its counsel Charles Manock ("Mr. Manock"), Dairy America claims that Hartford relied on Mr. Kays' original reports without contacting him during reconsideration of denial.

Mr. Spetz' September 13, 2006 letter ("second denial letter") to Mr. Holder reconfirmed Hartford's "position that the flood exclusion applies" to "again decline payment of this claim." Mr. Spetz declares that "denial of the claim was reaffirmed" based on the marine surveyor's conclusion of tidal wave cause of loss and "the lack of any evidence provided by DAIRY that the cause of damage was wind." The second denial letter concluded:

> The surveyor provided us with several photographs of the building, showing that after the hurricane, the lower portions of the building were missing, but the upper portions and the roof were intact. We find the damage to be consistent with the scenario of tidal (surge) waves impacting the building.
>
> In your letter of March 13, 2006, you asserted that some of the damage might have been caused by wind prior to the flood. We have no evidence to support that scenario. In our letter of April 24, 2006, we invited you to submit such evidence, but we have received no response. Based on the information provided by our surveyor and the absence of any contrary information, we must reaffirm our position that the flood exclusion bars coverage for Dairy America's loss.
>
> Because we are reaffirming our denial of this claim, we refer Dairy America to our letter of October 19, 2005 for notice of its rights under the Department of Insurance's regulations and notice of the policy's suit limitation clause. In our letter of April 24, 2006, we agreed that the running of the limitation period would toll during our re-examination of the claim. As of the date of this letter, the tolling will end. This letter

should not be construed as a waiver of any of Hartford Casualty Insurance Company's rights under the policy or at law.

In his declaration, Mr. Spetz explains:

> I entered into the voluntary tolling agreement set forth in my letter of April 24, 2006 so that reconsideration of the claim would not consume any part of the remaining balance of the 24 month suit limitation period, which had already been running for approximately six months following the denial of the claim on October 19, 2005.  When the claim decision was reaffirmed in my letter of September 13, 2006 the tolling period was ended leaving approximately 18 months of the 24 month suit limitation period.  Following the [sic] my letter of September 13, 2006 reaffirming the denial of the claim to counsel Glenn Holder I never received any further oral or written contact from or on behalf of DAIRY.

Mr. Spetz' October 25, 2006 email to surveyor Mr. Kays requested photos and concluded: "Looks like we are going to end up in litigation on this one."

Relying solely on Mr. Manock's declaration, Dairy America claims that on October 27, 2006, Hartford sent Dairy America Mr. Kay's October 28, 2005 followup report without photographs.

### Dairy America's Claims And Investigation

On February 16, 2007, Dairy America filed in state court its original complaint, which named as sole defendants NY Marine and Southern Marine, who removed the action to this Court.  On September 28, 2007, Dairy America filed its first amended complaint to add Gallagher as a defendant.

On August 7, 2007, Mr. Manock received the claims file of MMK International Marine Services Inc. ("MMK"), Mr. Kays' employer, and discovered Mr. Spetz' October 25, 2005 email to Mr. Kays to inquire if Mr. Kays had photographed "the warehouse area where the insured's product was located" and whether wind damage contributed to Dairy America's loss.

On November 29, 2007, Mr. Manock received document disclosures from Gallagher and discovered Gallagher employee Mr. Head's October 24, 2005 email to Mr. Spetz to raise the issue of wind contributing to Dairy America's loss.  Mr. Manock declares that after reviewing Mr. Head's October 24, 2005 email, he realized that Mr. Spetz' October 25, 2005 email to Mr. Kays "was probably an e-mail of first inquiry into whether wind damage was considered in response to the statement of Mr. Head.  I suspected that Hartford had been misrepresenting its position that flood, not wind, was the cause of the damage to the product."

At her February 15, 2008 deposition, Dairy America Comptroller Ms. McAbee testified she did

7

1   not know whether Dairy America had sued Hartford.  When informed Dairy America had not, Ms.

2   McAbee noted that she did not know why Dairy America had not sued Hartford.

3        On May 14, 2008, Dairy America filed its second amended complaint to add Hartford as a

4   defendant and a breach of contract claim against Hartford.  On May 11, 2009, Hartford filed its operative

5   third amended complaint ("TAC") to add a bad faith claim against Hartford.  The TAC alleges that

6   Hartford's failure to pay Dairy America's claim breached the Hartford policy and its implied covenant

7   of good faith and fair dealing and that Hartford failed to "conduct a reasonable investigation into the

8   cause of Plaintiff's claim."

9        As to Hartford, Dairy America seeks to recover $971,980 for its remaining unpaid loss and

10   punitive damages for bad faith.

11                              **DISCUSSION**

12                    **Summary Judgment Motion Standards**

13        Hartford contends that with tolling during its initial claim investigation and reconsideration of

14   denial, the 24-month limitations period to pursue an action against it expired on March 9, 2008, more

15   than 60 days prior to naming Hartford as a defendant, to render this action time barred.

16        Dairy America argues that California Code of Civil Procedure section 337's ("CCP 337's") four-

17   year limitations period for breach of contract applies and that equitable estoppel tolls even a 24-month

18   limitations period in that Hartford misrepresented or concealed evidence of the cause of Dairy America's

19   loss.  Dairy America claims that Hartford's summary judgment motion "is procedurally defective" by

20   referring to Dairy America's superseded second amended complaint and thus does not apply to Dairy

21   America's bad faith claim, which was first alleged in the TAC.

22        F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

23   all or part of the claim."  "A district court may dispose of a particular claim or defense by summary

24   judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

25   *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

26        Summary judgment is appropriate when there exists no genuine issue as to any material fact and

27   the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c); *Matsushita Elec. Indus.*

28   *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

1  *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to

2  "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

3  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

4  *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

5       On summary judgment, a court must decide whether there is a "genuine issue as to any material

6  fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v.*

7  *Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398

8  U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct.

9  486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

10  The evidence of the party opposing summary judgment is to be believed and all reasonable inferences

11  that may be drawn from the facts before the court must be drawn in favor of the opposing party.

12  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587,

13  106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require

14  submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

15  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

16       To carry its burden of production on summary judgment, a moving party "must either produce

17  evidence negating an essential element of the nonmoving party's claim or defense or show that the

18  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

19  persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

20  Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

21  1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

22  court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

23  *Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

24  Only disputes over facts that might affect the outcome of the suit under the governing law will properly

25  preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

26       "If a moving party fails to carry its initial burden of production, the nonmoving party has no

27  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

28  persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

1  "If, however, a moving party carries its burden of production, the nonmoving party must produce

2  evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

3  at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

4  fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

5  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

6  summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

7  the showing sufficient to establish the existence of an element essential to that party's case, and on

8  which that party will bear the burden of proof at trial.")

9  "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

10  the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

11  106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

12  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

13  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

14  289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

15  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

16  Moreover, given that "statutes of limitations are affirmative defenses," *Wyatt v. Terhune*, 315

17  F.3d 1108, 1117 (9th Cir. 2003), a defendant seeking summary judgment on an affirmative defense "must

18  establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his

19  favor." *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).

20  As discussed below, Dairy America demonstrates that Hartford is not entitled to judgment as a

21  matter of law and that factual issues bar summary judgment.

22  ## **Hartford's Calculation Of Tolling And Expiration Of The Limitations Period**

23  Hartford calculates that the 24-month (730-day) limitations period expired on March 9, 2008,

24  based on the following periods of tolling and running of the limitations period:

25  1.  From August 31, 2005 claim made to October 19, 2005 first denial letter – period tolled

26      during initial claim evaluation;

27  2.  From October 19, 2005 first denial letter to April 24, 2006 reopening letter – period runs

28      for 187 days;

3.  From April 24, 2006 reopening letter to September 13, 2006 second denial letter – period tolled during reopening of claim evaluation; and

4.  From September 13, 2006 second denial letter to May 14, 2008 naming Hartford as defendant – period runs 608 days for a total of 795 days, including the 187 days during October 19, 2005 to April 24, 2006.

Hartford points out that with the tolling, 730 days expired on March 9, 2008, more than two months before Dairy America named Hartford as a defendant.

Hartford notes the absence of mitigating factors to further toll the limitations period in that:

1.  The first denial letter advised Dairy America of the limitations period;

2.  Dairy America was represented by counsel after the first denial letter;

3.  The reopening letter noted Hartford's voluntary tolling of the limitations period;

4.  The second denial letter advised Dairy America's counsel that tolling ended;

5.  Dairy America originally filed this action against NY Marine and Southern Marine on February 16, 2007 and later named Gallagher as a defendant; and

6.  At her February 15, 2008 deposition, Ms. McAbee was advised that Dairy America had not yet sued Hartford.

Dairy America does not quibble with Hartford's calculations for running and tolling of a two-year limitations period because Dairy America contends that CCP 337's four-year limitations period applies, or alternatively, that Hartford is estopped to invoke expiration of a two-year limitations period. Dairy America begins its analysis with a review of insurance policy interpretation.

**Insurance Policy Interpretation**

"The California Supreme Court has established a three-step process for analyzing insurance contracts with the primary aim of giving effect to the mutual intent of the parties." *In re K F Dairies, Inc. & Affiliates v. Fireman's Fund Ins.*, 224 F.3d 922, 925 (9th Cir. 2000) (citing *AIU Ins. Co. v. Superior Ct.*, 51 Cal.3d 807, 821-823, 274 Cal.Rptr. 820 (1990)). "The first step is to examine the 'clear and explicit' meanings of the terms as used in their 'ordinary and popular sense.'" *In re K F Dairies,* 224 F.3d at 925 (quoting *AIU Ins.*, 51 Cal.3d 807, 822, 274 Cal.Rptr. 820). "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." *AIU Ins.*, 51

11

Cal.3d at 822, 274 Cal.Rptr. 274.

If an insurance policy term is ambiguous, a court "proceeds to the second step and resolves the ambiguity 'by looking to the expectations of a reasonable insured.'" *In re K F Dairies*, 224 F.3d at 926 (quoting *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 875, 21 Cal.Rptr.2d 691 (1993)). "Under California law, an insurance policy provision is 'ambiguous when it is capable of two or more constructions both of which are reasonable.'" *In re K F Dairies.*, 224 F.3d at 926 (quoting *Bay Cities*, 5 Cal.4th 854, 875, 21 Cal.Rptr.2d 691).

If the ambiguity remains, "it is construed against the party who caused the ambiguity to exist." *In re K F Daires*, 224 F.3d at 926 (citing *AIU Ins.*, 51 Cal.3d at 822, 274 Cal.Rptr. 280). "In the insurance context, this almost always is the insurer, as the California Supreme Court has held that ambiguities are generally resolved in favor of coverage . . . and that the courts are to 'generally interpret the coverage clauses of insurance policies broadly, protecting objectively reasonable expectations of the insured.'" *In re K F Dairies*, 224 F.3d at 926 (quoting *AIU Ins.*, 51 Cal.3d at 822, 274 Cal.Rptr. 280). "The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer." *Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 1198, 1204, 89 P.3d 381 (2004).

"The interpretation of a contract, including the resolution of any ambiguity, is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence." *American Alternative Ins. Corp. v. Superior Court*, 135 Cal.App.4th 1239, 1245, 37 Cal.Rptr.3d 918 (2006). However, if contract interpretation rests on credibility of conflicting extrinsic evidence, such issue is for the trier of fact:

> As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract. (*Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891-892 & fn. 4 [222 Cal.Rptr. 455] [where conflicting extrinsic evidence is admitted to interpret language of agreement, the proper procedure is "for the trial court to require the jury to make special findings on the disputed issues and then base its interpretation of the contract on those findings"].)

*Morey v. Vannucci,* 64 Cal.App.4th 904, 913-914, 75 Cal.Rptr.2d 573 (1998).

Fundamental rules of contract interpretation are based on the premise that interpretation of a contract must effectuate the parties' "mutual intention." *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370 (1995). The parties' mutual intention at the time the contract is formed governs

interpretation.  Cal. Civ. Code, § 1636; *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d 370.  The clear and explicit meaning of contract provisions, interpreted in their ordinary popular sense, unless used by the parties in a technical sense or a special meaning is given them by usage, controls judicial interpretation. Cal. Civ. Code, §§ 1638, 1644; *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d 370.

With these standards in mind, this Court turns to the parties' respective arguments.

### Enforcement Of 24-Month Limitations Period

Hartford argues that the Hartford policy's 24-month limitations period is enforceable and favored under California law.  Hartford points to the 12-month limitations period under California Insurance Code section 2071 ("IC 2071") for the California Standard Form Fire Insurance Policy: "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 12 months next after inception of the loss."  Hartford notes the following from *Prudential-LMI Com. Insurance v. Superior Court*, 51 Cal.3d 674, 684, 274 Cal.Rptr. 387 (1990):

> When a clause in an insurance policy is authorized by statute, it is deemed consistent with public policy as established by the Legislature. . . . In addition, the statute must be construed to implement the intent of the Legislature and should not be construed strictly against the insurer (unlike ambiguous or uncertain policy language). . . .
>
> The purpose of a statute of limitations is "'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" (Citations omitted.)

In *Prudential-LMI Com. Insurance*, 51 Cal.3d at 691, 274 Cal.Rptr. 387, the California Supreme Court favored the one-year limitations period of IC 2071 over CCP 337's general four-year limitations period for breach of contract: "[W]e conclude the Legislature's intent to provide insureds with a full year (excluding the tolled period) in which to commence suit can be inferred from the fact that the period provided by section 2071 is considerably shorter than the usual four years for ordinary contracts (Code Civ.Proc., § 337) . . ."  Hartford contends that if the Legislature desired to grant insureds a four-year limitations period, IC 2071's one-year limitations period "would not exist."

Based on the Hartford policy's enforceable two-year limitations period, Hartford contends Dairy America's action is time barred.  Hartford notes that from the October 19, 2005 first denial letter to the

13

April 24, 2006 reopening letter, 187 days "ran unabated."  Hartford explains that the limitations period

was tolled from the April 24, 2006 reopening letter to the September 13, 2006 second denial letter, at

which time the limitations period started to run.  Hartford contends that Dairy America had up to March

9, 2008, 543 days from the September 13, 2006 second denial letter to file action against Hartford.

Hartford concludes that Dairy America's delay to May 14, 2008 to name Hartford as a defendant dooms

its claims against Hartford, especially considering that Dairy America had filed prior complaints to name

NY Marine, Southern Marine and Gallagher as defendants.

Dairy America responds that IC 2071 is inapplicable and that Hartford improperly attempts to

expand IC 2071's reach to "all breach of insurance contract actions."  Dairy America explains that

California Insurance Code section 2070 ("IC 2070") and IC 2071 "make clear that the one-year statute

of limitations applies only with respect to standard fire insurance policies and losses involving the peril

of fire."

IC 2070 addresses the standard fire policy form and provides:

> **All fire policies** on subject matter in California shall be on the standard form, and, except as provided by this article shall not contain additions thereto. No part of the standard form shall be omitted therefrom except that any policy providing coverage against the peril of fire only, or in combination with coverage against other perils, need not comply with the provisions of the standard form of fire insurance policy or Section 2080; provided, that **coverage with respect to the peril of fire**, when viewed in its entirety, is substantially equivalent to or more favorable to the insured than that contained in **such standard form fire insurance policy**. (Bold added.)

IC 2071 recites that it provides "the standard form of fire insurance policy for this state."

This Court agrees with Dairy America that neither IC 2070 nor IC 2071 "by its terms apply a

one-year statute of limitations for claims by insureds on **all** insurance contracts."  (Bold added.)  Dairy

America is correct that to apply a one-year limitations period to all property insurance contracts, the

California Legislature "would have expressly stated so in Section 2071 and would not have limited that

provision to fire insurance policies."  Dairy America insightfully points out the Hartford policy's absence

of the California standard form fire insurance policy endorsement and its one-year limitations provision.

Moreover, the California Supreme Court's decision in *Prudential-LMI Commercial Insurance*,

51 Cal.3d 674, 274 Cal.Rptr. 387, does not invoke IC 2071's application to the facts at hand.  Before the

California Supreme Court was the issue "when does the standard one-year limitation period . . .

contained in all fire polices (pursuant to Ins.Code, § 2071) begin to run in a progressive property damage case." *Prudential-LMI Commercial Insurance*, 51 Cal.3d at 678, 274 Cal.Rptr. 387.  The California Supreme Court limited its holding to standard homeowners fire policies:

> . . . we emphasize that our holding is limited in application to the first party progressive property loss cases in the context of a homeowner's insurance policy. . . . Accordingly, we intimate no view as to the application of our decision in either the third party liability or commercial liability (including toxic tort) context.

*Prudential-LMI Commercial Insurance*, 51 Cal.3d at 679, 680, 274 Cal.Rptr. 387 (noting that the plaintiff insured's policy "contained the standard one-year suit provision first adopted by the Legislature in 1909 as part of the 'California Standard Form Fire Insurance Policy'").

Hartford's reliance of IC 2071 is unsubstantiated.  Hartford fails to justify extrapolation of IC 2071 to insurance policies other than standard fire policy forms and in turn negation of CCP 337 as to the Hartford policy.  Hartford's resort to the non-analogous standard fire policy form is unavailing.

### Application Of Four-Year Limitations Period

Hartford argues that the phrase in the Hartford policy's limitation provision "unless a longer time is provided by applicable statute" does not refer to the CCP 337's general four-year breach of contract limitations period and "does not give rise to [such] presumption."  Hartford contends that based on the one-year limitations period of IC 2071, CCP 337 does not govern breach of an insurance contract.  Hartford explains that "'[i]f the Legislature wanted to afford insureds the full measure of the general four year breach of contract statute of limitation provided by Code of Civil Procedure § 337 it would not have enacted Ins. Code § 2017."  Hartford characterizes IC 2071 as the "applicable statute that governs the time period for suit against an insurer for the breach of a written property insurance contract."

Dairy America responds that the "contested issue" is the meaning of "unless a longer time is provided by applicable statute" given Hartford's "unreasonable interpretation" that the phrase does not apply to CCP 337.  Dairy America interprets the 24-month limitations provision to apply "unless there is a statute which applies to the Hartford Policy and provides a limitations period of greater than 24 months."  Dairy America argues that if the "applicable statute" refers to IC 2071, the contingency "unless a longer time is provided by statute" is meaningless to violate the rule of construction "that all words in a contract are to be given meaning."  Dairy America argues that CCP 377 is the "applicable

15

statute" in that it provides a longer period of time to pursue an action.  As such, Dairy America concludes that it timely filed its action against Hartford prior to October 19, 2009, four years from the first denial letter.

Dairy America points to several California cases which applied CCP 337's four-year limitations period to insurance policy actions.  *See Archdale v. American Intern. Specialty Lines Ins. Co.,* 154 Cal.App.4th 449, 467, n. 19, 64 Cal.Rptr.3d 632 (2007) (CCP 337 applies to policy action limited to contract remedies); *Frazier v. Metropolitan Life Ins. Co.*, 169 Cal.App.3d 90, 101, 214 Cal.Rptr. 883 (1985) (plaintiff "is entitled to proceed upon a contract theory entitling her to a four-year statute of limitations. Hence her action is not time-barred."); *Jessica H. v. Allstate Ins. Co.*, 155 Cal.App.3d 590, 592, 202 Cal.Rptr. 239 (1984) ("An action on an insurance contract is subject to the time limitations of section 337."); *Casey v. Metropolitan Life Ins. Co.,* __ F.Supp.2d __, 2010 WL 682464, at *11 (E.D.Cal. 2010) ("An insured electing to proceed in tort is burdened with a shorter statute of limitations (2 years), whereas a longer statute (4 years) governs contract actions."); *see also McDowell v. Union Mutual Life Insurance Co.,* 404 F.Supp. 136, 145 (C.D. Cal. 1975) ("Plaintiffs can properly found their bad faith contract claim on § 337(1) and its four year statute of limitations provision.")

Hartford points to *Graingrowers Warehouse Co. v. Central Nat. Ins. Co. of Omaha, Neb.,* 711 F.Supp. 1040 (E.D. WA1989), where a fellow district court addressed a limitations provision similar to that in the Hartford policy and which provided that "[n]o suit on this Policy shall be valid unless . . . the suit is commenced within one (1) year (unless a longer period is provided by applicable statute)." In granting summary judgment for defendant insurers that plaintiff insured's breach of contract claims were time barred, the fellow district court explained:

> The Court believes that upon reading the insurance contracts as a whole, an average person purchasing insurance would conclude that the one-year limitation provisions in the policies control unless a particular Washington statute invalidated such a provision and required a longer limitations period. Unfortunately for plaintiffs, Washington has no such statute. To conclude that Washington's general statute of limitations on contracts applies would render meaningless the reference to the one-year period of limitation, which is specifically authorized in Washington, and would give a strained or forced construction which would lead to an extension of the policy beyond what is fairly within its terms. Indeed, such a conclusion would void the contractual provision in every state which has a general statute of limitations.
>
>                . . .
>
> The Court concludes that the language "unless a longer period of time is provided

1    by applicable statute" is not ambiguous and was clearly intended to serve as a conformity
2    clause that would waive or amend the one-year policy limitation provisions only when
     there was an express statute prohibiting the one-year contractual limitations.

3    *Graingrowers Warehouse,* 711 F.Supp. at 1045; *see Bargaintown, D. C., Inc. v. Bellefonte Ins. Co.*,

4    54 N.Y.2d 700, 702, 426 N.E.2d 469 (1981) ("The court will not read the clause 'unless a longer period

5    of time is provided by applicable statute' as manifesting an intent to import the six-year Statute of

6    Limitations applicable to contract actions in general when to do so would necessarily be to ascribe to

7    the parties an intention to include a wholly meaningless reference to a one-year period of limitation.")

8            Hartford argues that the California Legislature enacted IC 2071 to provide a one-year limitations

9    period for breach of contract actions against insurers.  Hartford contends that the "applicable" limitations

10   period "cannot reasonably be interpreted to be longer than the 24 month period afforded by the policy."

11           Dairy America responds that Hartford relies on cases which "do not interpret California law."

12   Dairy America faults Hartford's inability to "set forth any California authority to support its

13   proposition."   Dairy America notes that a Washington appellate court distinguished *Graingrowers*

14   *Warehouse* as inapplicable to an insurance policy which does not include a statutory one-year fire policy

15   limitation.  *See Port of Seattle v. Lexington Ins. Co.*, 111 Wash.App. 901, 48 P.3d 334, 343 (2002)

16   ("*Graingrowers* is clearly distinguishable from our case because the policy in that case contained an

17   explicit 12-month limitation provision.") Dairy America argues that the rationale of *Graingrowers*

18   *Warehouse* does not apply here given the Hartford policy's absence of "the express limitations

19   provision" of IC 2071.

20           Here, the issue is whether CCP section 337 qualifies as an "applicable statute" to extend the

21   Hartford policy's two-year limitations period.  Dairy America points to California courts which have

22   applied CCP 337 to insurance policy actions.  Hartford relies on unpersuasive, out-of-state authorities

23   and provides no pertinent authority that a fire policy limitations provision applies to the Hartford

24   property and general commercial policy, which does not contain the IC 2071 limitation period or

25   language.  The California authorities demonstrate CCP 337's application to non-fire policies.  IC 2071

26   directly applies to fire policies, and nothing demonstrates extrapolation of it to policies like the Hartford

27   policy.  As a matter of law, Hartford fails to negate CCP 337's qualification as an "applicable statute"

28   and in turn its extension of the limitations period under the Hartford policy.

**Reconsideration Of Denied Claim**

Hartford argues that its reconsideration and reopening of claim evaluation neither resets commencement of the limitations period nor vacates the time period that previously elapsed since original claim denial.  Hartford contends that equitable tolling is limited up to the time of original claim denial and during reconsideration of claim denial.  Hartford explains that the September 13, 2006 second denial letter "neither vacated nor modified the commencement of the limitation period" that began with the October 19, 2005 first denial letter.

Hartford points to *Singh v. Allstate Ins. Co.*, 63 Cal.App.4th 135, 73 Cal.Rptr.2d 546 (1998), where the California Court of Appeal addressed application of tolling to an insured's request to the insurer to reconsider claim denial.  In *Singh*, 63 Cal.App.4th at 142, 73 Cal.Rptr.2d 546, the California Court of Appeal explained policy reasons to deny equitable tolling upon a reconsideration request:

> Once a claim has been made, the carrier has pursued its investigation, and the claim has been denied, the policies behind allowing equitable tolling have been fulfilled. The carrier's right to notice, and its ability to investigate and marshal any evidence it may need to defend, have been preserved. The insured has been provided at least some grounds, upon the denial, before being required to sue the carrier. Thereafter, however, the enforcement of the one-year limit works no injustice to either party.

The California Court of Appeal continued:  "The justifications for equitable tolling are absent, once the carrier has initially denied the claim. The policies supporting the shortened limitation period are then fully applicable, and no reason for further tolling exists."  *Singh*, 63 Cal.App.4th at 142, 73 Cal.Rptr.2d 546.

The California Court of Appeal explained reasons to deny tolling upon a reconsideration request:

> We believe there are firm reasons to hold that a request for reconsideration does not create an additional period of "equitable tolling."

> In the first place, as we have already described, the policies underlying equitable tolling cease to exist once the carrier has received notice, investigated the claim, and denied coverage. At the stage of a request for reconsideration, the carrier has already received notice of the claim and had an opportunity to investigate. The policyholder has not been required to file suit before the carrier has even decided the claim; the claim has already been denied and the plaintiff knows of a potential basis for suit.

> In the second place, if the carrier's conduct after denying coverage expressly waives the one-year limit, or, . . . induces the policyholder to forbear from filing suit, the doctrines of waiver and estoppel will avoid injustice on that score.

18

1        In the third place, beginning a new period of equitable tolling based merely on a request for reconsideration would be anomalous. By the simple expedient of making many requests for reconsideration, claimants could extend the one-year statute at will with successive periods of tolling.

*Singh*, 63 Cal.App.4th at 145, 73 Cal.Rptr.2d 546.

The California Court of Appeal concluded that "once an unequivocal denial has been made, the insured's later requests for reconsideration do not serve the purposes of and do not extend the period of equitable tolling." *Singh*, 63 Cal.App.4th at 148, 73 Cal.Rptr.2d 546.

The Ninth Circuit Court of Appeals also agrees that reopening tolling upon a request to reconsider claim denial "would contravene a strong public policy to encourage an insurance company to reconsider its original denial when confronted with potentially new facts.  If insurance companies were saddled with the situation that whenever [they] reconsidered an earlier decision it would inaugurate a new limitations period, companies would be reluctant to offer policy holders the luxury of a second evaluation." *Wagner v. Federal Emergency Mgmt. Agency*, 847 F.2d 515, 521 (9th Cir. 1988) (citations omitted).

Hartford is correct that "a request for reconsideration of a denied claim does not reset the suit limitation period."  Hartford voluntarily tolled the running limitations of the period during its reconsideration of claim denial.  Dairy America's reconsideration requests did not toll the limitations period which ran after the first denial letter up to the reopening letter and resumed running with the second denial letter.  Hartford should not be penalized for voluntarily tolling the limitations period during its reconsideration of claim denial.  The remainder of the limitations period restarted with the second denial letter.

Dairy America does not contend that the limitations period was reset with its reconsideration request.  Dairy America does not rely on tolling during Hartford's reconsideration of denial.  Dairy America relies on CCP 337's four-year limitations period, which did not expire prior to Dairy America's May 14, 2008 naming Hartford as a defendant.  Hartford's points about tolling during reconsideration of claim denial are inconsequential to this summary judgment decision.

### Equitable Tolling

Out of an abundance of caution, Dairy America seeks to invoke equitable tolling because

1   Hartford's "representations caused Dairy America to delay in filing suit."

2          An insurer may be estopped to assert a limitations defense if the insured shows that it reasonably

3   relied on the insured's representation of fact, as compared to a "'representation' that the policy does not

4   cover the insured's claim, or words to that effect." *Vu v. Prudential Property & Casualty Ins. Co.*, 26

5   Cal.4th 1142, 1152, 113 Cal.Rptr.2d 70 (2001).  "An estoppel may arise although there was no designed

6   fraud on the part of the person sought to be estopped." *Benner v. Industrial Acc. Com.,* 26 Cal.2d 346,

7   349-350, 159 P.2d 24 (1945).

8          Dairy America challenges Hartford's investigation into "possible wind damage" as inadequate

9   given Hartford's representations of no wind damage despite photos to the contrary and its expert

10  engineer's acknowledgment that the roof of the warehouse where its product was stored failed "due to

11  wind."  Dairy America contends that Hartford "misrepresented evidence of the cause of the loss to Dairy

12  America, either negligently through inadequate investigation, or fraudulently, through concealment,"

13  including failure to disclose that extreme winds ripped a hole in the warehouse roof.  Dairy America

14  argues that a factual question arises "whether Dairy America reasonably relied on Hartford's express

15  assertions that flood was the sole cause of the loss, that there was no evidence of wind damage to the

16  product, and its concealment of evidence of wind damage to the warehouse roof."

17         Dairy America points out that within days of its first denial letter, Hartford adjuster Mr. Spetz

18  emailed surveyor Mr. Kays to inquire whether wind contributed to Dairy America's loss and that

19  thereafter, Mr. Kays provided a final report with photos showing sun shining into the warehouse but

20  such photos were not provided to Dairy America in November 2005.  Dairy America notes that Hartford

21  did not provide Mr. Kays' final report until a year later in October 2006.  Dairy America continues that

22  it relied on Hartford's correspondence "as evidence that its claim was properly investigated and there

23  was no evidence of wind damage causing Dairy America's loss."  Dairy America explains its delay to

24  suspect that Hartford hid facts concerning Dairy America's loss in that on November 29, 2007, Dairy

25  America counsel Mr. Manock received documents to place Mr. Spetz' October 25, 2005 email to Mr.

26  Kays "into context."

27         Hartford responds that there is "no competent evidence" that Hartford or Mr. Spetz concealed

28  that "wind could have been a cause of the loss" or "misrepresented any fact to Dairy America that caused

1  it to forebear from filing suit."  Hartford notes that Dairy America and its broker Gallagher raised the

2  issue of wind damage as early as September and October 2005 in emails and telephone conversations

3  but that "Hartford simply found no evidence supporting that wind was a cause of the damage."

4       Dairy America's points as to equitable estoppel further support denial of summary judgment for

5  Hartford.  Although Dairy America satisfied CCP 337's four-year limitations period, Dairy America has

6  raised factual issues whether Hartford's treatment of wind damage contributed to Dairy America's delay

7  to pursue claims against Hartford.  This Court is not convinced that Hartford failed to adequately address

8  wind damage and notes merely that Dairy America has raised factual issues to explain its delay to pursue

9  claims against Hartford.

10                    **Procedural Defect**

11      Dairy America claims that Hartford seeks no more than summary adjudication on Dairy

12  America's breach of contract claim given that Hartford's summary judgment notice references Dairy

13  America's second amended complaint which lacked its bad faith claim.  Hartford responds that in the

14  absence of a contractual breach, a related bad faith claim "fails as a matter of law."  *See Waller*, 11

15  Cal.4th at 35, 44 Cal.Rptr.2d 370 (1995).  This Court need not address the purported procedural defect

16  given that summary judgment is denied on the merits of the limitations defense.  Moreover, the effects

17  of the purported notice defect appear minimal as the balance of Hartford's papers addressed the bad faith

18  claim.

19                   **CONCLUSION AND ORDER**

20      For the reasons discussed below, this Court DENIES Hartford summary judgment.

21      IT IS SO ORDERED.

22  **Dated:   May 21, 2010**                    **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE