1

2

3

4

5                    **IN THE UNITED STATES DISTRICT COURT**

6                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

8    DAIRY AMERICA, INC.,                    CASE NO. CV F 07-0537 LJO SMS

9               Plaintiff,                   **SUMMARY ADJUDICATION DECISION
                                             ON PUNITIVE DAMAGES**
10        vs.                                (Docs. 177, 178.)

11   NEW YORK MARINE AND GENERAL
     INSURANCE COMPANY, et. al,
12
                Defendants.
13   _____/

14                              **INTRODUCTION**

15        Defendant Hartford Casualty Insurance Company ("Hartford") seeks summary adjudication on

16   plaintiff Dairy America, Inc.'s ("Dairy America's") punitive damages claim in the absence of clear and

17   convincing evidence that a Hartford officer, director or managing agent denied in bad faith Dairy

18   America's cargo loss claim.  Dairy America responds that Hartford inadequately investigated Dairy

19   America's claim and concealed information to invoke coverage for Dairy America's loss to constitute

20   bad faith.  Dairy America further claims that the Hartford adjuster responsible to investigate and deny

21   Dairy America's claim is a Hartford managing agent.   This Court considered Hartford's summary

22   adjudication motion on the record without oral argument.[1]  For the reasons discussed below, this Court

23   DENIES Hartford summary adjudication on Dairy America's punitive damages claim.

24   _____

25        [1]        This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
     statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
26   to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
     document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
27   material and appropriate for summary adjudication.  Unless otherwise noted, this Court does not rule on objections in a
     summary adjudication context.
28

                                              1

# BACKGROUND

## The Parties

Dairy America, a Fresno corporation, markets and sells powder milk products for shipment throughout the United States and foreign countries.

In late summer or early fall 2004, Hartford issued a Special Multi-Flex Policy ("Hartford policy") to Dairy America with an October 1, 2004 to October 1, 2005 policy period. Dairy America characterizes the Hartford policy as "general commercial, all-risk" to have insured its powder milk product in transit.

## Denial Of Hurricane Katrina Loss

On August 29, 2005, Hurricane Katrina destroyed 59 loads of Dairy America's powder milk product at a Gulfport, Mississippi warehouse ("warehouse"). On August 31, 2005, Dairy America presented its claim to Hartford for the 59 loads. Dairy America also presented a claim to its ocean cargo insurer New York Marine and General Insurance Company ("NY Marine").[2]

Dairy America's claim was assigned to Hartford Senior General Adjuster Michael Spetz ("Mr. Spetz"). Dairy America characterizes Mr. Spetz as "responsible for investigating the claim and determining coverage." Hartford retained Matthews, Matson & Kelley, Ltd. ("MMK"), and MMK marine surveyor Stan Kays to investigate Dairy America's loss. Mr. Spetz' October 2, 2005 email to MMK senior adjuster Paul McSweeney ("Mr. McSweeney") stated:

> I spoke to Stan Kay[s] today. He indicated to me that he had sent you some preliminary information related to the loss. Could you please forward this to me. It does not look like our policy will cover the loss.[3]

Mr. Spetz also sent an October 2, 2005 email to Hartford home office claims consultant Theodore Dombrowski ("Mr. Dombrowski") regarding expected denial of Dairy America's claim:

> I have put together a denial letter on this loss. Let me know if you have any comments. It appears to me that we would not have any coverage for the loss as we have discussed

---

[2]     NY Marine, a former defendant who was granted summary judgment on Dairy America's breach of insurance contract claim, paid for the loss of 36 loads which initiated transit after the inception of NY Marine's ocean cargo policy. NY Marine denied coverage for the 23 loads which were in transit prior to inception of the NY Marine policy. In this action, Dairy America seeks payment for the 23 loads.

[3]     Dairy America notes that Mr. Spetz' email preceded Hartford's receipt of Mr. Kays' preliminary written report.

2

previously. . . . I **still do not have a report from the surveyor**, but have spoken to him and it looks like the 6 containers that were loaded are submerged in the gulf and that the stock that was not loaded into containers and just sitting in the warehouse, was washed out into the gulf.  (Bold added.)

By his October 13, 2005 email, Mr. McSweeney provided Mr. Spetz with Mr. Kays' preliminary report, dated September 25, 2005.  Mr. McSweeney had been on vacation to explain delay to provide Mr. Kays' preliminary report, which explained:

. . . the P & O sheds, located on the West Pier, including the shed where the milk product was stored, were struck by a 25' tidal wave (surge wave) which completely blew out all shed building sides, doors, etc., and/or caused sheds to parially [sic] or completely collapse and fall apart.  All cargoes within these sheds including the Milk Powder was swept/carried away by the aforsaid [sic] storm surge.

By an October 15, 2005 email, Mr. Spetz forwarded Mr. Kay's preliminary report to Mr. Dombrowski and noted "no questions about the flood issue as I see it."  Mr. Dombrowski's October 17, 2005 email to Mr. Spetz responded: "From your comments this does appear to flood related and is your call."

Mr. Spetz' October 19, 2005 letter ("first denial letter") to Dairy America Comptroller Jean McAbee ("Ms. McAbee") denied Dairy America's claim based on the Hartford policy's "Flood, Water Under the Ground" exclusion ("flood exclusion").[4]  The first denial letter stated that "[w]e have determined that there would be no coverage for this loss."

**Further Investigation Into Loss**

In an October 24, 2005 email to Mr. Spetz, Michael Head ("Mr. Head"), a claims executive of Dairy America's insurance broker Arthur J. Gallagher, Inc. ("Gallagher"),[5] raised wind damage as a

---

[4]      The flood exclusion provides:

a.  We will not pay for loss or damage caused by, resulting from, arising out of, or in any way related to:

(1) Flood which means:

(a) Surface water, waves, tidal water, tidal waves, tsunamis, or overflow of any natural or man made body of water from its boundaries, all whether driven by wind or not.

. . .

[5]      This Court granted Gallagher, a former defendant, summary judgment on Dairy America's professional negligence and related claims against Gallagher

1   cause of Dairy America's loss:

2   > If The Hartford intends to argue that flood was the sole cause of the insured's loss, I
3   > assume that the carrier can provide documentation confirming. Given the magnitude of
    > the storm, it is our position that the warehouse would have first been damaged by wind
    > long before any alleged flood, resulting in a covered loss. . . . Any wind damage to the
4   > insured's warehouse would certainly have resulted in damage to the insured's product.

5   Mr. Spetz forwarded Mr. Head's email to Mr. Dombrowski to keep Mr. Dombrowski "advised as the

6   stock was valued at $2,000,000."

7   Mr. Spetz followed up with an October 25, 2005 email to surveyor Mr. Kays to ask:

8   > Did you take any photos of the warehouse area where the insured's product was located?
    > I [sic] there is any chance that the warehouse was damaged by wind and our insured's
9   > product or a portion of it was damaged before the storm surge?

10  On October 25, 2005, Mr. Kays went to the warehouse and took photographs. Prior to that date,

11  Mr. Kays had not determined where Dairy America's product was stored in the warehouse.[6]

12  Mr. Kays prepared an October 28, 2005 final report regarding his October 25, 2005 follow-up

13  survey. As to the cause of Dairy America's loss, Mr. Kays' final report provided:

14  > It is our belief and opinion that the extensive water damages sustained to the captioned
    > shipment reportedly stowed in eight (8) ocean containers as well as the greater portion
15  > of the shipment stored/staged in stuffing Warehouse No. 16, West Pier, Port Gulfport,
    > Mississippi, resulted from a reported 25' tidal wave (surge wave) associated with
16  > Hurricane Katrina passing by and making landfall to the West of Gulfport, Mississippi,
    > on August 29, 2005. In our opinion the reported 25' tidal wave (surge wave) caused the
17  > sides of Warehouse No. 16 to be blown out and Powdered Dry Milk cargo to be
    > swept/carried away and damaged.

18

19  Dairy America notes that the report neither mentioned investigation into wind damage nor acknowledged

20  Mr. Spetz' October 25, 2005 email inquiry as to wind damage.

21  Twenty photos were attached to Mr. Kays' October 28, 2005 report. Eight photos depicted the

22  warehouse and 12 photos depicted damaged shipping containers. Dairy America notes that one photo

23  depicts "a large patch of sunlight shining down into the warehouse storing Dairy America's lost

---

24  [6]   In his deposition, Mr. Kays explained the difficulty to inspect the scene:

25  . . . When you go into a situation like this and you can't find your cargo, you can't find other cargos, there's
26  complete and total devastation, I don't even know what building my cargo was in or the different cargos
    were in.

27
    There was nobody there to talk to. There was nobody there to point me in a direction and say,
28  This is where it was. This is what happened. You know, you're just put in a situation . . .

4

product." Dairy America further notes that one of Mr. Kays' two photos of the warehouse interior "shows sunlight shining through the roof" and that Mr. Kays October 28, 2005 report did not note roof damage.

Pictometry International took a September 9, 2005 aerial photo of the warehouse which stored Dairy America's powder milk product. According to Dairy America, the photo depicts "an approximately 2,000 square foot hole in the roof of the warehouse in the area where Dairy America's product was stored." Dairy America notes that Mr. Kays did not take "any direct pictures" of the warehouse roof's large hole and did not note the hole in his reports.

In his deposition, Mr. Spetz explained that Hartford did not "insure the building so I wouldn't be concerned with the roof":

> Q.   But considering that Gallagher had suggested that the wind came up and caused the damage to the product, wouldn't you be then concerned whether the roof was intact?
>
> A.   We went back and spoke to Stan Kays and his conclusion was the same, that there was a storm surge and it was not caused from wind.
>
> Q.   And you testified in your first deposition that the roof was intact, correct?
>
> A.   As far as I know yes, the roof was intact.
>
> . . .
>
> Q.   And did you see any damage in the photographs sent to you by Mr. Kays that was consistent, in your experience, with damage to a structure caused by wind?
>
> A.   I did not.[7]

In his deposition, Mr. Kays noted that he "didn't see the damage to the roof" and "didn't do an investigation of it." When asked if he did "a visual inspection of inside the building," Mr. Kays responded:

> I really wasn't there for the building. I was there looking for the cargo or evidence that the cargo was there. I was looking for damaged cargo. The building was incidental, in that this is where the cargo was housed. I didn't know it would be an issue later.

---

[7]   In a prior deposition, Mr. Spetz testified that based on photographs "there's not any wind damage, the roof is totally intact. The sides are intact. All the side lights are intact. And you've got damage where the siding is taken out on this building. It was all shoved in and it all tore off approximately . . . 10, 18 feet up in the air, which is basically indicative of the surge coming in and going through the building."

1      . . .

2          . . . Everything was flushed, in my opinion, out of the warehouse due to wave and
       surge action.

3

4      Mr. Kays further testified that "the roof was intact" and "[i]f it wasn't intact, I would have made

5      mention of it in my report."  Mr. Kays testified that he did not investigate light shining through the

6      warehouse roof.  Dairy America points to the absence in Mr. Kays' report of photos of "the

7      approximately 2000 square foot hole in the warehouse roof," although his photos showed light shining

8      through the warehouse's roof and the hole existed when he inspected the warehouse.

9      Dairy America notes the opinion of Hartford expert engineer David Vanderostyne ("Mr.

10     Vanderostyne") that the warehouse roof "failed due to wind . . . during the peak of the storm."  Mr.

11     Vanderostyne noted that peak winds hit the warehouse after "a significant amount of water penetrated

12     the warehouse . . . to start damaging the product."

13     In response to Gallagher claims executive Mr. Head's telephone request, Mr. Spetz, on

14     November 28, 2005, emailed Mr. Head three photos of the warehouse, none of which, using Dairy

15     America's words, "showing sunlight shining through the roof."

16     With his December 2, 2005 email, Gallagher vice president Dennis Olsen ("Mr. Olsen")

17     requested Mr. Spetz to provide "additional photos of the building including interior pictures."  Mr. Spetz

18     responded with a December 19, 2005 email attaching 11 photos of shipping containers and noting that

19     Mr. Spetz "did not have any photos of the interior of the building."[8]

20     **Reconsideration Of Denial**

21     With his March 3, 2006 letter to Mr. Spetz, Dairy America's counsel Glenn Holder ("Mr.

22     Holder") requested reconsideration of denial in that wind prior to flooding may have contributed to the

23     loss.  Mr. Holder's letter further requested "an explanation of Hartford's denial of coverage, including

24     a report of any [sic] how the investigation was conducted and how the conclusion was reached that the

25     storm surge was entirely responsible for the damage."

26     Mr. Spetz' April 24, 2006 letter ("reopening letter") to Mr. Holder stated that "[a]lthough we are

27

28         [8]    Dairy America characterizes the statement as untrue given that Mr. Kays' October 28, 2005 report included
       two warehouse interior photos.

reopening our investigation, at the present time, our position remains as stated in our October 19, 2005 letter." Mr. Spetz' letter explained:

> In response to your questions, the photographs of the loss location were provided by a surveyor jointly retained by us and Dairy America's other insurer. The surveyor did personally inspect the location and report that the damage was caused by tidal surge/waves (i.e., flood). Although you speculate that some damage may have been caused by wind prior to the flood, we have no information supporting that scenario. Please provide us with any such information.

Mr. Spetz' September 13, 2006 letter ("second denial letter") to Mr. Holder reconfirmed Hartford's "position that the flood exclusion applies" to "again decline payment of this claim" in that the damage is "consistent with the scenario of tidal (surge) waves impacting the building." The second denial letter concluded:

> The surveyor provided us with several photographs of the building, showing that after the hurricane, the lower portions of the building were missing, but the upper portions and the roof were intact. We find the damage to be consistent with the scenario of tidal (surge) waves impacting the building.
>
> In your letter of March 13, 2006, you asserted that some of the damage might have been caused by wind prior to the flood. **We have no evidence** to support that scenario. In our letter of April 24, 2006, we invited you to submit such evidence, but we have received no response. Based on the information provided by our surveyor and the absence of any contrary information, we must reaffirm our position that the flood exclusion bars coverage for Dairy America's loss. (Bold added.)

### Dairy America's Claims

Dairy America proceeds on its operative third amended complaint ("TAC") to allege that Hartford's failure to pay Dairy America's claim breached the Hartford policy and its implied covenant of good faith and fair dealing and that Hartford failed to "conduct a reasonable investigation into the cause of Plaintiff's claim." The TAC seeks to recover $971,980 for Dairy America's remaining unpaid loss and punitive damages for Hartford's bad faith claim denial.

### Dairy America's Expert Opinion On Hartford's Bad Faith

To support its punitive damages claim, Dairy America relies on former claims executive and current consultant James O'Malley ("Mr. O'Malley"), whom Dairy America retained to address "whether Hartford's [sic] or its agents acted in bad faith according to industry standards" and whether the record reveals "conduct which is dishonest, fraudulent or oppressive in the context of industry standards." In his declaration, Mr. O'Malley opines that Hartford "investigated and handled Dairy

7

America's claim in bad faith with intentional disregard for the rights of Dairy America under their [sic] policy with Hartford." Mr. O'Malley further opines that Hartford "acted in a dishonest, fraudulent and oppressive manner in investigating and handling Dairy America's claim" "to keep Dairy America from knowing that there was damage to the roof of the warehouse in order to prevent Dairy America from knowing that they had a valid insurance claim."

Mr. O'Malley bases his opinions on his following observations:

1. Mr. Spetz' October 25, 2005 email to Mr. Kays shows that Mr. Spetz "did not consider or investigate the possibility that Dairy America's product may have been damaged prior to the storm surge or discuss this possibility with Stan Kays before denying Dairy America's claim";

2. When Mr. Spetz sent his April 24, 2006 reopening letter to claim Hartford lacked "information supporting the position that the damage may have been caused by wind prior to the storm surge[,] he was in possession of photographic evidence of the fact that the warehouse had been damaged by wind as well as the storm surge";

3. An experienced insurance surveyor "could not have conducted an inspection of this warehouse and not seen the large hole in the roof of the warehouse and not known that this roof damage was evidence of wind damage" and would have conducted "an investigation of the building where the insured product was located to insure that there was no wind related damage to the building";

4. Mr. Kays "intentionally chose" to exclude his failure "to take photographs of the large hole in the warehouse roof where Dairy America's product was located" and "to disclose the existence of this hole in the roof in his final report" because such evidence "was contrary to his previously stated opinion that the sole cause of the damage to Dairy America's product was from storm surge";

5. Mr. Spetz failed to provide Mr. Head all warehouse photos to prevent Dairy America from seeing "evidence of wind damage" to the warehouse roof;

6. Mr. Spetz denied he possessed photos of the warehouse interior "because one of those photographs showed damage to the roof of the warehouse" although Mr. Kays' October

8

28, 2005 final report included warehouse photos;

7.   In response to Mr. Head's October 24, 2005 email to consider wind damage prior to storm surge, Hartford "did nothing but send an email to the surveyor asking him if it was possible the warehouse was damaged prior to the storm surge";

8.   After reopening investigation, Hartford "conducted no further investigation whatsoever into the possibility of wind damage" prior to the storm surge;

9.   Hartford failed to confirm whether Stan Kays investigated wind as contributing to damage as requested in the October 25, 2005 email and claimed to lack "information supporting the position that damage may have been caused by wind prior to the flood when Hartford was already in possession of sufficient evidence to know that there was wind damage to the warehouse" and failed to investigate "if this damage was done prior to the storm surge"; and

10.  Mr. Spetz and Mr. Kays' testimony of no wind damage to the warehouse and that its roof was intact demonstrates that "Hartford did not conduct an investigation into the possibility that the wind had damaged the warehouse prior to the storm surge."

**Absence Of Wrongful Conduct Of An Officer, Director Or Managing Agent**

Hartford challenges Dairy America's punitive damages claim in the absence of clear and convincing evidence that a Hartford officer, director or managing agent engaged in wrongful conduct to warrant punitive damages.  Hartford points to the roles within Hartford of Mr. Spetz and home office claims consultant Mr. Dombrowski, whom Hartford identifies as the persons chiefly responsible to deny Dairy America's claim.

In his deposition, Mr. Spetz described his responsibilities:

. . . I work for the large loss organization part of the Hartford – so as a general adjustor or senior general adjustor, we actually handle any loss that's a hundred thousand dollars or more.  So I could get an assignment for a hundred thousand dollar loss or one for $10 million.  And my job is to go out and inspect the loss and determine what the damages are and adjust it.

Q.   Now, does that require you to be in the field when you say inspect the loss?

A.   Yes.

9

1    Mr. Spetz further explained that he reviews forms and determines "when I do the investigation, do we

2    have a loss that's covered or not."

3        Mr. Spetz pointed out that coverage decisions are "elevated":

4    Q.    . . . ultimately, who would determine whether or not there was coverage?  It
         wouldn't be you, would it?

5        . . .

6    A.    I would do the investigation, do the inspection.  Okay.  If there were questions
         about whether we had a covered loss or not then that would be elevated.

7

8    Q.    And elevated would mean what?

9    A.    It would go up the chain to the supervisor and then to the home office.

10   Q.    And who had the final say in that in terms of coverage?

11   A.    In coverage, well, it would depend on the amount of loss.  But in most cases,
         probably the home office consultant.

12       . . .

13       . . . if there was a question of coverage, it would still have to go up to the
         home office for a final decision on whether we covered a loss or not.

14

15       In his declaration, Mr. Dombrowski explains that he assists claims personnel regarding inquiries

16   as to policy forms, including inland marine, ocean marine, international, property, and livestock, and

17   responds to "discreet and individualized questions from claims personnel regarding pending claims."

18   Mr. Dombrowski notes that his assistance "applies solely to the individual facts of any given loss" and

19   that his input is limited to "individual claims" which he is asked to review.

20       Mr. Dombrowski denies:

21   1.    Serving as a Hartford director, officer or managing agent;

22   2.    Responsibility to create Hartford "corporate policies" or "general principles"; and

23   3.    "[S]ubstantial authority over decisions that set the general principals and rules that

24       govern the adjustment and resolution of claims."

25       As to Dairy America's loss, Mr. Dombrowski notes that he "responded to several emails and

26   telephone calls" from Mr. Spetz, who "had several questions regarding whether the product was still 'in

27   transit' or was being stored for a longer period of time at the Port of Gulfport."  Mr. Dombrowski

28   declares that Mr. Spetz informed Mr. Dombrowski of his conclusion "that the loss to the milk powder

10

1   product was caused by the storm surge" and that Mr. Spetz made the "coverage decision regarding the

2   applicability of flood exclusion."  Mr. Dombrowski concludes that he "was not requested to provide

3   input on this issue regarding the Dairy America claim."

4          In his declaration, Dairy America attorney Charles Manock ("Mr. Manock") notes that he

5   reviewed Hartford's claim file which lacks evidence of "correspondence or other documents showing

6   that Mr. Spetz received any guidance from the Hartford's home office in handling and investigating

7   Dairy America's claim."

8                                            **DISCUSSION**

9                          **Summary Judgment/Adjudication Standards**

10         Hartford seeks summary adjudication that Dairy America's punitive damages claim is barred

11  given the absence of fraud, oppression or wrongdoing by a Hartford officer, director or managing agent.

12         F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

13  all or part of the claim."  "A district court may dispose of a particular claim or defense by summary

14  judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

15  *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

16         Summary judgment/adjudication is appropriate when there exists no genuine issue as to any

17  material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c);

18  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W.*

19  *Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of

20  summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether

21  there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International*

22  *Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

23         On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to

24  any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c);

25  *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress*

26  *& Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464,

27  467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th

28  Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and

all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(d)(2), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others."  *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial."  *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, Dairy America raises factual issues whether Hartford's conduct, by a managing agent, was malicious, oppressive or fraudulent in conscious disregard of Dairy America's rights under the Hartford policy to bar summary adjudication.

## **Punitive Damages – Malice, Oppression Or Fraud**

### *California Law In General*

California Civil Code section 3294 ("section 3294") provides that in an action "for breach of an obligation not arising from contract," a plaintiff may seek punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code, § 3294(a).  Section 3294(c)(1)–(3) defines:

1.   "Malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights and safety of others";

2.   "Oppression" as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights"; and

3.   "Fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact

known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

Punitive damages are "available to a party who can plead and prove the facts and circumstances set forth in Civil Code section 3294." *Hilliard v. A.H. Robbins Co.*, 148 Cal.App.3d 374, 392, 196 Cal.Rptr. 117 (1983).  Punitive damages are never awarded as a matter of right, are disfavored by the law, and should be granted with the greatest of caution and only in the clearest of cases. *Henderson v. Security Pacific National Bank*, 72 Cal.App.3d 764, 771, 140 Cal.Rptr. 388 (1977).

"Punitive damages aren't available in California for simple breaches of contract, no matter how willful." *Slottow v. American Cas. Co.*, 10 F.3d 1355, 1361 (9th Cir. 1993).  "Rather, the breach must have been tortious, and the breaching party must have 'been guilty of oppression, fraud, or malice.'" *Slottow*, 10 F3d at 1361 (quoting Cal. Civ. Code, § 3294).

"'Clear and convincing' evidence requires a finding of high probability." *Mock v. Michigan Millers Mut. Ins.*, 4 Cal.App.4th 306, 332, 5 Cal.Rptr.2d 594 (1992).  The clear and convincing standard requires evidence "'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.'" *Mock*, 4 Cal.App.4th at 332, 5 Cal.Rptr.2d 594 (citations omitted.)

### *Punitive Damages In Claims Handling Context*

"Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby establish that it has acted with the requisite malice, oppression or fraud to justify an award of punitive damages." *Mock*, 4 Cal.App.4th at 328, 5 Cal.Rptr.2d 594.  To establish that "an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by clear and convincing evidence that the insurer has acted maliciously, oppressively or fraudulently." *Mock*, 4 Cal.App.4th at 328, 5 Cal.Rptr.2d 594.  Conduct required to impose punitive damages for the tortious breach of contract "is of a different dimension" than that required to find bad faith. *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal.App.4th 847, 890, 93 Cal.Rptr.2d 364 (2000).

"Where the plaintiff's ultimate burden of proof will be by 'clear and convincing' evidence, the higher standard of proof must be taken into account in ruling on a summary judgment motion." *Basich v. Allstate Ins. Co.*, 87 Cal.App.4th 1112, 1118, 105 Cal.Rptr.2d 153 (2001) (affirming summary

1  adjudication that insurer was not subject to punitive damages for bad faith).  To meet the clear and

2  convincing standard, "some evidence should be required that is inconsistent with the hypothesis that the

3  tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness,

4  mere negligence or other such noniniquitous human failing." *Tomaselli,* 25 Cal.App.4th at 1288, n. 14,

5  31 Cal.Rptr.2d 433 (quoting *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 362  (Ind. 1982)).

6       An insurer's unreasonable actions do not equate to malice.  *See Patrick v. Maryland Cas. Co.*,

7  217 Cal.App.3d 1566, 1575, 267 Cal.Rptr. 24 (1990).  For instance, punitive damages may not be

8  imposed for an insurer's actions "found to be negligent (failing to follow up information provided by

9  the insured), overzealous (taking an unnecessary deposition under oath of the insured), legally erroneous

10  (relying on an endorsement which was not shown to have been delivered), and callous (failing to

11  communicate)."  *Tomaselli*, 25 Cal.App.4th 1269, 1288, 31 Cal.Rptr.2d 433.  A "consistent and

12  unremedied pattern of egregious insurer practices' [is required] in order for the insurer's 'bad faith'

13  conduct to rise to the level of malicious disregard of the insured's rights so as to warrant the imposition

14  of punitive damages."  *Mock*, 4 Cal.App.4th at 329, 5 Cal.Rptr.2d 594 (1992) (citations omitted).

15       Hartford broadly argues that it engaged in no fraud, oppression or malice in handling Dairy

16  America's claim.  Hartford points to its timely claim investigation and Mr. Spetz' determination that a

17  25-foot tidal wave caused Dairy America's loss based on "preliminary evidence, reports, and a final

18  report" of marine surveyor Mr. Kays.  Hartford explains that it agreed to reconsider Dairy America's

19  claim to address whether wind caused damage and that Dairy America failed to submit support

20  documentation.  Hartford concludes that nothing contradicts determination that the tidal wave caused

21  Dairy America's loss.

22       Dairy America responds that it "has set forth evidence sufficient to allow a jury to find a 'high

23  probability' that the Hartford's actions constituted malice, fraud or oppression."  Dairy America accuses

24  Hartford of "wrongfully denying Dairy America's claim on the preconceived conclusion that water from

25  the storm surge caused the loss of Dairy America's product."  Dairy America further accuses Mr. Spetz

26  of keeping himself and "his superior" Mr. Dombrowski "willfully ignorant" with failure to conduct an

27  adequate investigation, concealing photos from Dairy America showing warehouse damage, and

28  misrepresenting that Hartford reopened its investigation into wind as contributing to Dairy America's

loss. As discussed below, Dairy America, unlike Hartford, specifically addresses malice, oppression and fraud.

### *Fraudulent Conduct*

Dairy America notes that fraudulent conduct may be shown by an insurer's misrepresentation, concealment or deceit "in connection with unreasonable conduct in handling or investigating an insured's claim." *See Pistorius v. Prudential Ins. Co. of America*, 123 Cal.App.3d 541, 555-556, 176 Cal.Rptr. 660 (1981). Dairy America argues that Hartford's fraudulent conduct is reflected by:

1.  An absence of evidence that Hartford conducted further investigation into wind contributing to Dairy America's loss after Hartford misrepresented that it would reopen its investigation;

2.  Hartford's post reopening efforts limited to an examination under oath of Dairy America comptroller Ms. McAbee;

3.  Hartford's failure to recontact Mr. Kays, during its reopened investigation, to confirm that he had investigated wind damage to the warehouse prior to a storm surge;

4.  Mr. Spetz' November 28, 2005 email sending Gallagher's Mr. Head three photos, none showing sunlight shining through the warehouse roof;

5.  Mr. Spetz' December 19, 2005 email to Gallagher's Mr. Olsen that Mr. Spetz had no photos of the warehouse's interior and sending photos of damaged shipping containers;

6.  Mr. Spetz' possession of Mr. Kays' October 28, 2005 final report with two photos of the warehouse's interior;

7.  Mr. Spetz' September 13, 2006 second denial letter stating that Mr. Kays' photos showed the warehouse's "upper portions and the roof intact" and that Hartford lacked evidence of wind damage prior to flooding although Mr. Kays' photos depicted sunlight through the warehouse roof; and

8.  The Pictometry International September 9, 2005 aerial photo showing a 2,000 square foot hole in the warehouse roof.

Reasonable inferences drawn from Dairy America's evidence create genuine factual issues of Hartford's highly probable misrepresentations and concealments beyond mistake or an honest error in

16

judgment.  Throughout his investigation and reopening, Mr. Spetz consistently denied the potential of wind to contribute to Dairy America's loss.  Mr. Spetz continually took the position that the warehouse roof was intact to dispel wind damage.  However, Mr. Spetz, based on viewing the evidence in Dairy America's favor, possessed photos that no less than raise the possibility that wind contributed to Dairy America's loss.  The record lacks evidence of Hartford's concrete re-investigation after it reopened its claim evaluation.  There is no evidence that Hartford followed up with Mr. Kays after it reopened it investigation.  The reasonable inference is that Hartford simply reviewed again Mr. Kays' reports and 20 photos and left it to Dairy America to prove wind damage.  In the absence of Hartford's meaningful evidence to rebut the question of its fraudulent conduct, factual issues remain whether Hartford engaged in fraudulent conduct to warrant punitive damages.

### *Malicious And Oppressive Conduct*

Punitive damages may be considered based on an insurer's "unreasonable interpretation of its policy and the deliberate restriction of its investigation in a bad faith attempt to deny benefits" due to the insured.  *See Amadeo v. Principal Mut. Ins. Co.*, 290 F.3d 1152, 1165 (9th Cir. 2002) (applying California law).

Dairy America claims Hartford "deliberately restricted its investigation of the loss and ignored obvious evidence of damage to the warehouse" due to its following observations:

1. Mr. Spetz' September 2, 2005 email, two days after Dairy America's claim, noted that "it does not look like our policy will cover the loss";

2. Mr. Kays' did not know where Dairy America's product was stored in the warehouse and had to estimate where it was located;[9]

3. Hartford initially denied Dairy America's claim "without investigating possible wind damage";

4. Mr. Kays testified that he was not hired to survey the warehouse, which was "incidental"

---

[9]   Dairy America claims that "Mr. Kays did not know which warehouse stored Dairy America's product at the time he concluded his preliminary report."  Dairy America appears to distort Mr. Kays' testimony in that Mr. Kays was asked: "Prior to the 25th of October, had you determined **where the product was stored in Warehouse 16**?"  (Bold added.) Mr. Kays responded: "No.  I was never able to get that information."  Mr. Kays testimony reflects at most that he was unaware where in the warehouse Dairy America's product was stored, not that he did not know which particular warehouse stored Dairy America's product.

1     to his investigation";

2     5.     Mr. Spetz' October 25, 2005 email, less than a week after Hartford's initial denial, asked
3            Mr. Kays whether he photographed the warehouse area where Dairy America's product
4            was located and whether wind contributed to damage the warehouse and Dairy America's
5            product;

6     6.     Mr. Kays' sent his October 28, 2005 final report to Hartford with photos showing sun
7            shining into the warehouse;

8     7.     An experienced insurance surveyor could not have inspected the warehouse without
9            seeing the large roof hole and not known the hole was evidence of wind damage and
10           would have investigated where the insured's product was located to determine whether
11           wind contributed to the loss; and

12    8.     On November 28, 2005, Mr. Spetz emailed Gallagher's Mr. Head three warehouse
13           photos, none of which show sunlight shining down into the warehouse.

14    Dairy America argues that "these facts suggest that Mr. Spetz denied the claim without considering

15    whether high winds caused any of the loss." Dairy America accuses Hartford of oppressively burdening

16    Dairy America with the obligation to demonstrate that wind contributed to its loss given that Dairy

17    America's duty was limited to cooperate in Hartford's investigation. Dairy America characterizes

18    Hartford's conduct as "reckless disregard for Dairy America's rights under the Policy."

19           The evidence raises inferences that Hartford made a snap decision to deny Dairy America's claim

20    without the benefit of a full, competent investigation. Mr. Spetz' October 2, 2005 emails raise an

21    inference that he prejudged claim denial without Mr. Kays' preliminary report. The record reflects that

22    Mr. Kays focused his efforts on the cargo, not the warehouse building, and reasonable inferences from

23    the evidence suggest potential damage from wind. After Gallagher and Dairy America raised the issue

24    of wind damage, the evidence suggests that Hartford was unrelenting with its determination that a tidal

25    wave caused all damage to Dairy America's product, even after Hartford knew there were questions with

26    Mr. Kays' investigation and its scope. The key problem for Hartford is the absence of details of efforts

27    to consider and substance to rule out wind damage. Reasonable inferences arise that Mr. Kays and in

28    turn Hartford unreasonably remained steadfast that a tidal wave alone damaged Dairy America's product.

Hartford's handling of photos further raises questions whether its conduct was malicious and oppressive. Dairy America demonstrates that at least one of Mr. Kays' photos depict sun shining through the warehouse roof and that Mr. Kays did not photograph the roof. Hartford appears to have withheld key photos until this litigation. The evidence, including Mr. O'Malley's declaration, raises factual issues that Mr. Spetz deliberately restricted investigation into potential wind damage and blindly accepted Mr. Kays' evaluation when Mr. Spetz knew of potential problems with it. As such, factual issues exist whether Hartford, in particular Mr. Spetz, acted maliciously and oppressively in investigating and evaluating Dairy America's loss.

**Punitive Damages – Officer, Director Or Managing Agent**

Given questions whether Mr. Spetz acted fraudulently, maliciously and oppressively, the focus turns to whether he qualifies as a Hartford managing agent.

Hartford argues that Dairy America's punitive damages claim fails with no clear and convincing evidence that a Hartford officer, director or managing agent is culpable of malice, oppression or fraud. Dairy America responds that "Mr. Spetz exercised sufficient discretionary authority over Dairy America's claim to qualify him as a managing agent."

Section 3294(b) addresses requirements to impose punitive damages against employers:

> An employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation.

"While an employer may be liable for an employee's tort under the doctrine of respondeat superior, he is not responsible for punitive damages where he neither directed nor ratified the act." *Merlo v. Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 18, 130 Cal.Rptr. 416 (1976).

Section 3294 requires proof of wrongful conduct among corporate leaders: the "officer[s], director[s], or managing agent[s]." Cal. Civ. Code, § 3294(b); *Cruz v. HomeBase*, 83 Cal.App.4th 160, 166, 99 Cal.Rptr.2d 435 (2000). In *Cruz*, 83 Cal.App.4th at 166-167, 99 Cal.Rptr.2d 435, the California Court of Appeal explained:

This is the group whose intentions guide corporate conduct. By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate "state of mind" or the intentions of corporate leaders. This assures that punishment is imposed only if the corporation can be fairly viewed as guilty of the evil intent sought to be punished.

"The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy." *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 822, 169 Cal.Rptr. 691 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271 (1980). "Managing agents" are employees who "exercise[] substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal.4th 563, 573, 88 Cal.Rptr.2d 19 (1999). "'[C]orporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations." *Cruz*, 83 Cal.App.4th at 167, 99 Cal.Rptr.2d 435.

An act of oppression, fraud or malice, by an officer, director or managing agent, is sufficient to impose liability on a corporate employer for punitive damages, without an additional showing of ratification by the employer. Cal. Civ. Code, § 3294(b); *Agarwal v. Johnson*, 25 Cal.3d 932, 950, 160 Cal.Rptr. 141 (1979), *overruled on other grounds*, *White*, 21 Cal.4th 563 at 574, n. 4, 88 Cal.Rptr.2d 19; *Kelly-Zurian v. Wohl Shoe Co., Inc.*, 22 Cal.App.4th 397, 420, 27 Cal.Rptr.2d 457, 469 (1994). The critical inquiry whether employees act in a managerial capacity is "the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." *Egan*, 24 Cal.3d at 822-823, 169 Cal.Rptr. 691; *see Kelly-Zurian*, 22 Cal.App.4th at 420, 27 Cal.Rptr.2d at 470 (evidence that a supervisor had power to terminate and supervise employee's performance was insufficient to establish managing agent).

The California Supreme Court has explained:

We therefore conclude that in amending section 3294, subdivision (b), the Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over

20

1  significant aspects of a corporation's business.

2  *White*, 21 Cal.4th at 576-577, 88 Cal.Rptr.2d at 29; *see Myers v. Trendwest Resorts, Inc.*, 148

3  Cal.App.4th 1403, 1437, 56 Cal.Rptr.3d 501 (2007) (critical inquiry is the degree of discretion the

4  employees possess to make decisions that will ultimately determine corporate policy).

5  Hartford contends that Mr. Spetz, as a senior general adjuster, was not a Hartford officer, director

6  or managing agent in that he "was assigned claims in the field to assess, investigate, and determine

7  whether coverage existed for the loss." Hartford relies on Mr. Spetz' deposition testimony that he

8  "specifically" handles claims and that coverage decisions are made at an "elevated" level in the home

9  office. Hartford notes that Mr. Spetz does not craft Hartford general guiding principles or establish

10 corporate-wide rules in that "coverage decisions are driven by analysis of each individual claim" and that

11 "Mr. Spetz' conclusions regarding coverage were reviewable by any number of superiors." Hartford

12 concludes that Mr. Spetz's role was limited to "merely adjusting Dairy America's claim."

13 Dairy America responds that "Mr. Spetz exercised broad authority in the disposition of Dairy

14 America's claim." Dairy America argues that the evidence disputes Mr. Spetz' claim that he lacked

15 "final say" on coverage determination. "When employees dispose of insureds' claims with little if any

16 supervision, they possess sufficient discretion for the law to impute their actions concerning those claims

17 to the corporation." *Egan*, 24 Cal.3d at 822, 169 Cal.Rptr. 691 (claims adjuster and claims analyst

18 "exercised broad discretion in the disposition of plaintiff's claim" to warrant imposition of punitive

19 damages).

20 The record suggests that Mr. Spetz disposed of Dairy America's claim with little supervision.

21 Hartford home office claims consultant Mr. Dombrowski declares that Mr. Spetz made the "coverage

22 decision regarding the applicability of flood exclusion." The evidence reflects that Mr. Spetz and Mr.

23 Dombrowski were the only Hartford employees involved in the coverage determination and that Mr.

24 Dombrowski's contribution was minimal to leave ultimate determination to Mr. Spetz, who engaged in

25 all direct communications and dealings with Dairy America and Gallagher, including the denial and

26 reconsideration letters. There is no evidence that Mr. Spetz sought or received higher approval of his

27 denial of Dairy America's claim. The evidence reflects that Mr. Spetz did not question the absence of

28 coverage to eliminate pursuing a final decision by the Hartford home office. Mr. Spetz had broad and

1   seemingly unfettered disposition over Dairy America's claim to no less than raise factual issues whether

2   he his managing agent, similar to the *Egan* claims personnel.

3        To attempt to avoid application of *Egan*, Hartford notes that *Egan* was decided prior to the

4   section 3294(b)'s amendment to reference "managing agent" rather than *Egan*'s reference to "managerial

5   employee."  However, *Egan* remains solid law, and Hartford points to no authority to undermine its

6   application despite its characterization of Mr. Spetz as a "general adjuster."

7        Turning to Mr. Dombrowski, Hartford notes his limited involvement of emails and telephone

8   calls with Mr. Spetz regarding duration of storage of Dairy America's product and whether the product

9   was in transit.  Hartford points to Mr. Dombrowski's inability to impact substantially corporate

10  operations or to establish Hartford corporate practices or policies.  Hartford characterizes Mr.

11  Dombrowski as "a sounding board, advising adjusters on discreet and individualized questions regarding

12  coverage of claimed losses."  Hartford describes Mr. Dombrowski's assistance to adjusters as "always

13  fact specific, and applicable only to the circumstances of a particular claim."

14       Unlike Mr. Spetz, there is no issue, under the present circumstances, whether Mr. Dombrowski,

15  acted as a Hartford officer, director or managing agent.  The evidence and his title suggest that Mr.

16  Dombrowski consults on claim evaluation, and there is no evidence that he disposes of claims with little

17  supervision.  Nothing suggests that he exercises substantial discretionary authority over decisions that

18  ultimately determine corporate policy.  The evidence fails to raise an issue whether he crafts Hartford

19  general guiding principles or establishes corporate-wide rules.

20                              **Ratification Of Mr. Kays' Conduct**

21       Dairy America argues that Hartford is further subject to punitive damages by ratifying Mr. Kays'

22  actions in that Mr. Spetz, as a managing agent, approved Mr. Kays' inadequate investigation and

23  "adopted his inadequately supported conclusion."

24       To impose punitive damages on corporate or other large organizations, the malicious, fraudulent

25  or oppressive conduct must have been performed by an agent employed in a "managerial capacity" and

26  acting in the scope of employment, or ratified or approved by a "managerial agent" of the organization.

27  *College Hospital Inc. v. Superior Court*, 8 Cal.4th 704, 723, 34 Cal.Rptr.2d 898 (1994) (citing *Egan*,

28  24 Cal.3d at 822, 169 Cal.Rptr. 691.  "For purposes of determining an employer's liability for punitive

damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties." *College Hospital*, 8 Cal.4th at 726, 169 Cal.Rptr. 691.

To support ratification, Dairy America points to Mr. Spetz' reliance on Mr. Kays' investigation findings to deny coverage, although Mr. Spetz knew that Mr. Kays had not addressed wind contributing to damage of Dairy America's product given that he asked Mr. Kays to consider wind damage after initial claim denial. Dairy America attributes Mr. Spetz to have known Mr. Kays' investigation was inadequate in that Mr. Kays' did not know where Dairy America's product was stored in the warehouse, had to estimate where it was located, and considered the warehouse "incidental" to his investigation.

Dairy America raises factual issues whether Hartford, through Mr. Spetz, ratified conduct supporting punitive damages. The evidence raises questions as to the adequacy of Mr. Kays' investigation and whether it was result driven, and in turn, whether Mr. Spetz turned a blind eye to its inadequacy and continued to champion claim denial despite serious questions as to wind contributing to damage to Dairy America's product. The purported holes in Mr. Kays' investigation raise questions whether he consciously disregarded Dairy America's rights as an insured.

In sum, Dairy America has raised factual issues as to Mr. Spetz' managing agent status and whether his and Mr. Kays' conduct was malicious, oppressive or fraudulent in conscious disregard of Dairy America's rights under the Hartford policy to bar summary adjudication for Hartford.

## **CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1.      DENIES Hartford summary adjudication on Dairy America's punitive damages claim; and

2.      CONFIRMS the July 15, 2010 pretrial conference and August 30, 2010 trial.

IT IS SO ORDERED.

**Dated:   June 17, 2010**                          _____/s/ Lawrence J. O'Neill_____
                                                                    UNITED STATES DISTRICT JUDGE

23